IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

```
                                    )
BRADLEY WILLCOX and FRANK           )
DOMINICK,                           )
                                    )
         Plaintiffs,                )
                                    )
    vs.                             )   Civ. No. 13-00508 ACK-RLP
                                    )
LLOYDS TSB BANK, PLC, a bank        )
organized and existing under the   )
laws of the United Kingdom, and    )
DOES 1-15,                          )
                                    )
         Defendants.                )
                                    )
```

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

### PROCEDURAL BACKGROUND

On September 13, 2013, Plaintiff Bradley Willcox filed his original complaint, on behalf of himself and a similarly situated class, against Lloyds TSB Bank, PLC, now known as Lloyds Bank PLC ("Lloyds" or "Defendant"), in the Circuit Court of the First Circuit, State of Hawaii. (Doc. No. 1 ("Notice of Removal") Ex. A.) On October 7, 2013, Lloyds removed the case to federal court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332. (Notice of Removal at 3-7.)[1] On December 3, 2013, Willcox

---

[1]Two similar class action suits against Lloyds were filed in the U.S. District Court for the Northern District of California: Dugan et al. v. Lloyds TSB Bank, Civ. No. 3:12-cv-02549-WHA (N.D. Cal.) and Osmena et al. v. Lloyds TSB Bank, Civ. No. 3:12-cv-02937-WHA (N.D. Cal.). On February 21, 2013, the Dugan and Osmena cases were [continued on next page]

-1-

filed the operative First Amended Complaint, amending the factual allegations and adding Frank Dominick as a named plaintiff. (Doc. No. 25 ("FAC").)

On December 17, 2013, Lloyds filed the instant Motion to Dismiss the Claims Asserted in the First Amended Complaint ("Motion" or "Def.'s Mot."), along with several exhibits. (Doc. No. 26.) On February 10, 2014, Plaintiffs filed a memorandum in opposition ("Opposition" or "Pls.'s Opp."), also supported by several exhibits. (Doc. No. 28.) On February 14, 2014, Lloyds filed a reply ("Reply" or "Def.'s Reply"). (Doc. No. 30.)

On March 3, 2014, this Court held a hearing regarding Defendant's Motion.

On March 6, 2014, the Court issued a minute order directing the parties to submit supplemental briefing addressing (1) whether the application of Hong Kong law would preclude Plaintiffs' Hawaii and U.S. statutory claims and (2) whether Hong Kong had similar statutes. (Doc. No. 32.)

On March 20, 2014, Plaintiffs filed an Ex Parte Application for Extension of Time ("Ex Parte Application") to

_____

consolidated. (N.D. Cal. ECF Nos. 92 & 113.) On October 15, 2013, Lloyds informed this Court of its Motion for Transfer of Related Actions to the Northern District of California for Coordinated or Consolidated Pretrial Proceedings pursuant to 28 U.S.C. § 1407, filed with the United States Judicial Panel on Multidistrict Litigation. (Doc. No. 5.) On February 14, 2014, the Panel issued an order denying Lloyds' Motion for Transfer of Related Actions. (Doc. No. 29.)

file their supplemental brief. (Doc. No. 34.) On March 21, 2014, Lloyds filed a Response to Plaintiffs' Ex Parte Application. (Doc. No. 35.) On March 21, 2014, after carefully considering the parties' submissions, the Court issued a minute order granting the extension of time and directing the parties to file their supplemental briefs by April 14, 2014. (Doc. No. 36.)

On April 14, 2014, Plaintiffs and Lloyds filed their supplemental briefs (respectively, "Pls.'s Supp. Brief" and "Def.'s Supp. Brief"). (Doc. Nos. 37-38.) Also on April 14, 2014, Lloyds filed a Notice of Intent to Rely on Foreign Law, Pursuant to Federal Rule of Civil Procedure 44.1. (Doc. No. 39.)

On April 24, 2014, the Court issued a minute order after Plaintiffs requested in their supplemental brief (and Ex Parte Application) that Plaintiffs be allowed to file a response to Lloyds' supplemental brief. (Doc. No. 41.) In the April 24, 2014 minute order, the Court granted Plaintiffs' request to file a response to Lloyds' supplemental brief and allowed Lloyds - as the moving party - to file a reply to Plaintiffs' response. (Id.)

On May 13, 2014, Plaintiffs filed a response to Lloyds' supplemental memorandum ("Pls.'s Supp. Resp."). (Doc. No. 42.)

On May 23, 2014, Lloyds filed a reply to Plaintiffs' response ("Def.'s Supp. Reply"). (Doc. No. 46.)

# FACTUAL BACKGROUND[2]

This case involves the issuance by Lloyds of dual currency, or International Mortgage System ("IMS"), loans. Lloyds is organized under the laws of the United Kingdom and maintains branches throughout the world, including a branch in Hong Kong, through which Lloyds issued IMS loans to Plaintiffs. (FAC ¶¶ 9-10; Def.'s Mot. at 5.)

## A.    The IMS Loan Provisions

IMS loans are mortgage loans with a currency switching feature that allows borrowers to switch the currency of their loans between U.S. Dollars and other currencies. This case concerns IMS loans secured by mortgages on real property located in Hawaii and California. (FAC ¶ 3.) These loans all had an interest rate set at 1.5% above the "Cost of Funds" with the interest period fixed for successive three month periods. The Cost of Funds was defined as "the cost (calculated to include the costs of complying with liquidity and reserve assets requirements) in respect of any currency expressed as a percentage rate of funding for maintaining the advance or

---

[2]The facts as recited in this Order are for the purpose of disposing of the current motion and are not to be construed as findings of fact that the parties may rely on in future proceedings. For purposes of this Motion, the Court accepts as true all well-pleaded factual allegations in the FAC, but need not accept as true allegations that contradict the FAC's exhibits or documents incorporated by reference. See Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008).

advances in that currency as conclusively nominated by the Bank from time to time." (Id. ¶¶ 3 & 14; Def.'s Mot. Ex. A at 3.)

The loans also included a "Security Top-Up Clause," a borrowing restriction measured by a specified loan-to-value ratio ("LTV Ratio"), or the difference between the collateral value and the amount of the loan outstanding. (Def.'s Mot. Exs. A-E at 6; Ex. F at 7.) Specifically, the loan provisions stated that, in the event Lloyds determined that amounts due on the loan exceeded the LTV Ratio, Lloyds had the right to demand that the borrower "top-up" the security for the loan:

> If at any time the Bank in its absolute discretion determines (whether because of foreign exchange movements, diminution in the Security Value or otherwise) that the ratio (expressed as a percentage) of the principal outstanding to the Security Value . . . exceeds the approved ratio as specified in the offer, then without prejudice to any other rights under the credit facility, the Bank may, at its option . . . give notice to the Borrower requiring within 10 business days to . . . provide the Bank with additional security over assets acceptable to the Bank . . . or deposit with the Bank in such currency as the Bank shall specify cash deposits . . . as the Bank shall require.").

(Def.'s Mot. Exs. A-E at 6.)

The loan documents also included certain disclaimers and acknowledgments regarding foreign exchange rates and interest rates. For example, among others, the IMS loan facility agreements included the following acknowledgments:

> I acknowledge that I am fully aware . . .

- that even if I have income denominated in the currency of my loan, this may not fully protect me if the loan currency appreciates in value against the currency of the asset being financed

- my exposure to foreign exchange rate risk may result in substantial losses that are potentially unlimited in amount . . .

- my costs of meeting interest charges may increase, perhaps substantially, if relevant market rates of interest rise; and increased costs will also arise when measured against a certain currency if the loan currency appreciates in value against that other currency . . . [and]

- that I may have to make principal repayments or provide additional security to the Bank in accordance with the Security Top-up clause.

(Def.'s Mot. Exs. A-D at 9; Exs. E & F at 10.)

## B. The Named Plaintiffs' Loans

Plaintiff Bradley Willcox is a resident of Hawaii who, in 2007, took out approximately $1,284,500.00 in four IMS loans from Lloyds, secured by four real properties located in Honolulu, Hawaii. (FAC ¶¶ 7 & 22.) Willcox took out the IMS loans in U.S. Dollars and, shortly after the closing of the transaction, chose to redenominate them in Japanese Yen. (Id. ¶ 23.) After he did so, the exchange rate began to fall, meaning the Yen grew stronger relative to the U.S. Dollar, and the interest rate on Willcox's loans rose. (Id. ¶ 25.) Willcox alleges that the "dramatic increase" in his interest payments was a product, in part, of Lloyds' "arbitrary increases" in its Cost of Funds. (Id.

¶ 26.) Willcox states that, as a result of these arbitrary
increases, he has paid substantially more than he otherwise would
have over the course of the loan. (Id. ¶ 27.)

In 2008 and 2009, the strong Yen caused the paper value
of Willcox's loans to increase in comparison to the value of the
underlying properties securing the loans, as measured in dollars.
(Id. ¶ 29.) Lloyds therefore required Willcox to pledge $250,000
in cash or assign an investment of sufficient value as a "top-up"
to re-set the LTV Ratio under the loan facility agreement.
Willcox agreed to pay "several thousand dollars of additional
principal on a monthly basis." (Id. ¶¶ 28-30.)

Plaintiff Frank Dominick is a legal resident of Hong
Kong and a U.S. citizen. (Id. ¶ 8.) In early 2007, he took out
approximately $2,700,000.00 in an IMS Loan from Lloyds, secured
by property located in Honolulu, Hawaii, as well as a second IMS
Loan for approximately $1,762,500.00, secured by a property in
Los Angeles, California. (Id. ¶¶ 8 & 31-33.) Dominick states that
his loans were always denominated in Yen. (Id.) Lloyds asserts
that Dominick chose to denote his loans in Yen, and notes that
the facility agreements governing Dominick's loans set forth the
loan amounts in dollars. (Def.'s Mot. Exs. E & F.) Regardless, as
was the case for Willcox, once the exchange rate began to drop
(and the Yen grew stronger in relation to the dollar), Dominick's
interest rate on his loans rose. (FAC ¶ 36.) Dominick alleges

that his quarterly interest payments had risen "dramatically" by 2012. (Id.) Specifically, Dominick alleges that his payments on the Hawaii property loan in March 2007 were equivalent to approximately $18,500.00 in U.S. Dollars, but that the payments had increased to roughly the equivalent of $28,300.00 by September 2012. (Id. ¶ 39.) Dominick alleges that this drastic increase was the result of Lloyds' arbitrary increases of its Cost of Funds. (Id. ¶ 40.)

In 2008 or 2009, the stronger Yen caused the paper value of Dominick's loans to increase in comparison to the value of the mortgaged properties, and Lloyds required Dominick to "top-up" his loan, or provide additional collateral to correct the LTV Ratio to 75% of the collateral. (Id. ¶ 37.) In 2010, Dominick provided $100,000 in cash to Lloyds for this purpose. (Id.) In addition, Dominick alleges that he made "substantial" improvements to the mortgaged properties to increase their value. (Id. ¶¶ 37-38.) Also in 2010, at Lloyds' request, Dominick agreed to cross-collateralize his loans so that the California property secures the Hawaii property (and vice versa). (Id. ¶ 38.)

On June 27, 2012, Lloyds informed Dominick by letter that he was in default. (Id. ¶ 43.) Dominick has asked Lloyds for an explanation of its Cost of Funds increases, but alleges that Lloyds has refused to provide any relevant information. (Id. ¶ 44.) Dominick alleges that the Yen has recently dropped in

value as against the dollar, meaning that the LTV Ratio of his loans has been corrected. He states that he has therefore requested that Lloyds apply the $100,000 cash "top-up" he provided in 2010 towards payment of the principal of his loans. Lloyds has apparently refused to do so. (<u>Id.</u> ¶ 45.) Dominick alleges that he has paid significantly more money over the course of the loan than he otherwise would have as a result of Lloyds' increases in its Cost of Funds.

### C. Allegations Regarding the Cost of Funds

Plaintiffs allege that Lloyds arbitrarily increased the Cost of Funds component of the variable interest rates of the IMS loans, thereby substantially increasing the IMS loans' interest rates. (<u>Id.</u> ¶ 5.) Plaintiffs further allege that Lloyds increased its Cost of Funds during a time when standard indexes for interest rates, such as the London Inter-Bank Offered Rate ("LIBOR"), decreased. (<u>Id.</u>)

Plaintiffs assert that, from 1985 to approximately 2009, Lloyds used one method for calculating its Cost of Funds, but that in 2009, it added several basis points to the Cost of Funds in anticipation of the imposition by its parent company, Lloyds Banking Group, of a liquidity transfer pricing ("LTP") charge. (<u>Id.</u> ¶ 6.) Plaintiffs allege that Lloyds thus used the Cost of Funds to pass on to borrowers the cost of its "parent's overhead and operations as a whole," and not merely the cost of

funding the IMS loans. (<u>Id.</u>) As a result, Plaintiffs allege, the IMS loans were more profitable to Lloyds. (<u>Id.</u>)

Plaintiffs bring two claims for relief in their First Amended Complaint: (1) a claim for unfair and deceptive trade practices under Hawaii Revised Statutes ("H.R.S.") §§ 480-2 and 481A-3(a)(12); and (2) a claim for declaratory relief under H.R.S. §§ 632-1, <u>et seq.</u>, and 28 U.S.C. §§ 2201 and 2202. (<u>Id.</u> ¶¶ 61-77.)

## STANDARD

### A.  Rule 12(b)(6)

Federal Rule of Civil Procedure ("Rule") 12(b)(6) authorizes the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted." Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Court may dismiss a complaint either because it lacks a cognizable legal theory or because it lacks sufficient factual allegations to support a cognizable legal theory. <u>Balistreri v. Pacifica Police Dep't.</u>, 901 F.2d 696, 699 (9th Cir. 1988).

In resolving a Rule 12(b)(6) motion, the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations as true. <u>Sateriale v. R.J. Reynolds Tobacco Co.</u>, 697 F.3d 777, 783

(9th Cir. 2012). The complaint must contain sufficient factual matter accepted as true to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard. . . asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 556-57). However, in considering a motion to dismiss, "the court is not deciding whether a claimant will ultimately prevail but rather whether the claimant is entitled to offer evidence to support the claims asserted." Tedder v. Deutsche Bank Nat. Trust Co., 863 F. Supp. 2d 1020, 1030 (D. Haw. 2012) (citing Twombly, 550 U.S. at 563 n. 8).

Should a claim be dismissed, the court should grant leave to amend "even if no request to amend the pleading was made, unless it determines that the pleading could not be cured by the allegation of other facts." OSU Student Alliance v. Ray, 699 F.3d 1053, 1079 (9th Cir. 2012).

### B. Consideration of Materials Outside the Complaint

"Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint." Marder v. Lopez, 450 F.3d 445, 448 (9th Cir. 2006).

"A court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the documents; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." Id. The court is allowed to treat such documents as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." Id.

The Ninth Circuit has extended the "incorporation by reference" doctrine to situations in which a plaintiff does not explicitly allege the contents of the documents if "the plaintiff's claim depends on the contents of [the] document" and "the parties do not dispute the authenticity of the document." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005). The doctrine is intended to prevent plaintiffs from "surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." Parrino v. FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998).

In this case, the Court may consider Exhibits A to J of Defendant's Motion, Exhibits 1 to 5 and Exhibit 7 of Plaintiffs' Opposition, and Exhibit K of Defendant's Reply. Exhibits A to F are copies of the facility agreements signed by Plaintiffs Willcox and Dominick. Exhibits G to J are copies of the "Drawdown Instruction Form" for the facility agreements.

Exhibits 1 to 5 are copies of the mortgage agreements signed by
Plaintiffs, and Exhibit 7 is a copy of the facility agreement
signed by Plaintiff Willcox in October 2007. Exhibit K is a
complete copy of "International Mortgage Service Frequently Asked
Questions," dated July 2009, that Lloyds sent to Plaintiffs.
These documents are referred to extensively in the FAC, essential
to Plaintiffs' unfair and deceptive trade practices and
declaratory relief claims, and neither party questions the
documents' authenticity. (<u>See</u>, <u>e.g.</u>, FAC ¶¶ 3, 22-23, 33 & 64.)

Exhibit 6 of Plaintiffs' Opposition is a copy of the
Declaration of John Robert Brewer, a purported expert in Hong
Kong law, submitted by Lloyds in <u>Dugan et al. v. Lloyds TSB Bank</u>,
Civ. No. 3:12-cv-02549-WHA (N.D. Cal.), a similar class action
suit against Lloyds pending before the U.S. District Court for
the Northern District of California. (<u>See</u> Note 1 <u>supra</u>.) Although
the case is factually similar, <u>Dugan</u> involves different claims
and is at a different stage of litigation than the instant case.
<u>See</u> <u>Dugan</u>, Civ. No. 3:12-cv-02549-WHA. Further, and importantly,
the FAC does not refer to and Plaintiffs' claims do not depend on
the contents of Exhibit 6. Accordingly, the Court may not
consider Exhibit 6 of Plaintiffs' Opposition.

**DISCUSSION**

**I.**        **Choice of Law Analysis**

Lloyds argues that the First Amended Complaint should

-13-

be dismissed in its entirety with prejudice because Plaintiffs'

claims are barred by the Hong Kong choice of law provision in the

IMS loans' facility agreements. (Def.'s Mot. at 14-15.)[3/] That

---

[3/]Plaintiffs argue that Lloyds cannot assert that their
claims are precluded by operation of the facility agreements'
Hong Kong choice of law provision because Lloyds failed to
provide notice of its intent to rely on foreign law, as required
by Federal Rule of Civil Procedure 44.1 (Pls.'s Opp. at 24-25.)
Rule 44.1 provides, in relevant part: "A party who intends to
raise an issue about a foreign country's law must give notice by
a pleading or other writing." The Ninth Circuit has held that:

> The primary purpose of Rule 44.1's notice
> requirement is to avoid unfairly surprising
> opposing parties. . . . [N]otice of intent to
> raise an issue of foreign law, if not given
> in the pleadings, generally should be given
> before or during the pretrial conference, and
> normally a contention of application of
> foreign law should be disclosed at the latest
> in the pretrial order. It is only fair to
> provide notice of potential application of
> foreign law as early as is practicable and,
> in any event, at a time that is reasonable in
> light of the interests of all parties and the
> court. Nonetheless, Rule 44.1 does not
> require in all cases a cut-off date after
> which notice cannot be deemed reasonable.

DP Aviation v. Smiths Indus. Aerospace & Def. Sys. Ltd., 268 F.3d
829, 846-47 (9th Cir. 2001). Here, Lloyds filed a Notice of
Intent to Rely on Foreign Law, Pursuant to Federal Rule of Civil
Procedure 44.1, on April 14, 2014, well before any scheduled
pretrial conference or order. (Doc. No. 39.) Because Lloyds
provided notice of its intent to rely on foreign law at an early
procedural stage, the Court finds that Lloyds satisfied Rule
44.1.

Citing a recent decision from the U.S. District Court for
the District of Idaho, Plaintiffs further argue that Lloyds
failed to provide the "substance" of Hong Kong law, as required
by Rule 44.1. See Von Jones v. Chapungu Safaris, No. 1:11-cv-
00027-BLW, 2013 WL 5876280, at *3 (finding that Rule 44.1
requires that a party must "explain the [continued on next page]

provision states: "The transaction shall be governed by the laws of Hong Kong and the parties hereto agree to submit to the non-exclusive jurisdiction of the courts of Hong Kong." (E.g., Def.'s Mot. Ex. A at 7; Ex. E at 8.)[4/]

Plaintiffs note, however, that the mortgage agreements contain the following choice of law provision:

> This Security Instrument shall be governed by the laws of the United States of America and the laws of the State of Hawaii. In the event that any provision or clause of this Security Instrument, the Facility Agreement or the Secured Promissory Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument, the Facility Agreement or the Secured Promissory Note which can be given effect without reference to the conflicting provision. To this end, the provisions of this Security Instrument, the Facility Agreement and the Secured Promissory Note are declared to be severable. The parties acknowledge that the Facility Agreement and the Secured Promissory Note are made and enforceable under the laws of Hong Kong.

(Pls.'s Opp. Exs. 1-5 at 7, § 15.) Plaintiffs argue that, pursuant to this more specific choice of law provision, if the interest provisions in the facility agreement conflict with

_____

foreign law so that the court is in a position to apply the foreign country's law to the facts before it") (citing <u>Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.</u>, 181 F.3d 435, 440 (3d Cir. 1999)). Here, the Court finds that Lloyds' supplemental brief and the Hong Kong cases cited and attached thereto addresses Plaintiffs' concerns. (<u>See</u> Def.'s Supp. Brief Exs. A-N.)

[4/]The immediately following paragraph provides "[i]n the event of any dispute under or arising out of this transaction, service of any proceedings by the Bank upon the Borrower. . ." may be effected in several ways at the Bank's option.

H.R.S. Chapter 480 by constituting unfair and deceptive practices, Hawaii law controls. (Id. at 9.) Plaintiffs further argue that the choice of law provision in the facility agreements only governs "the transaction," and does not govern the instant action, which involves claims against Lloyds arising out of Lloyds' setting of the Cost of Funds after the close of the transaction. (Id.)

A federal court sitting in diversity must apply the choice of law rules adopted by the forum state. Welles v. Turner Entm't Co., 503 F.3d 728, 738 (9th Cir. 2007); P.W. Stephens Contractors, Inc. v. Mid Am. Indem. Ins. Co., 805 F. Supp. 854, 856 (D. Haw. 1992) (citing Klaxon v. Stentor Elec. Man. Co., 313 U.S. 487, 496 (1941)). This Court must therefore apply Hawaii choice of law principles in determining whether Hawaii law or Hong Kong law governs the instant suit. Both parties agree that Hawaii choice of law rules should govern. (Def.'s Supp. Reply at 3; Pls.'s Opp. at 12-13.)

### A.   Hawaii Choice of Law Principles

The Hawaii Supreme Court has stated that "[w]hen the parties choose the law of a particular state to govern their contractual relationship and the chosen law has some nexus with the parties or the contract, that law will generally be applied." Airgo, Inc. v. Horizon Cargo Transport, Inc., 670 P.2d 1277, 1281 (Haw. 1983) (citing Restatement (Second) of Conflict of Laws

§ 187 (1971)).[5/] Where the parties' contract includes a choice of law provision, the Hawaii Supreme Court is typically "guided by" section 187 of the Restatement (Second) of Conflict of Laws. See Del Monte Fresh Produce (Hawaii), Inc. v. Fireman's Fund Ins. Co., 183 P.3d 734, 741 (Haw. 2007) (citing Airgo, 670 P.2d at 1281); Ingalls v. Gvt. Employees Ins. Co., 903 F. Supp. 2d 1049, 1055 (D. Haw. 2012).[6/] Section 187 of the Restatement provides, in relevant part:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular

---

[5/]Two recent cases have applied the "some nexus" rule of Airgo without analyzing their respective choice of law provisions under the Restatement (Second) of Conflict of Laws ("Restatement") § 187. Gemini Ins. Co. v. Kukui'Ula Dev. Co., 855 F. Supp. 2d 1125, 1141 (D. Haw. 2012); Picardy v. Sky River Mgmt., LLC, 294 P.3d 1092 (Haw. Ct. App. 2013). Nevertheless, this Court is persuaded by Ingalls v. Gvt. Employees Ins. Co., 903 F. Supp. 2d 1049, 1055-56 (D. Haw. 2012), where the court analyzed the choice of law provision at issue in that case under § 187 of the Restatement. The Ingalls decision placed particular emphasis on Del Monte Fresh Produce, Inc. v. Fireman's Fund Ins. Co., 117 Haw. 357, 364 (Haw. 2007), which stated that the Hawaii Supreme Court is "typically guided" by section 187 of the Restatement. In any event, this Court finds that - under Gemini and Picardy's choice of law analysis - there is a "sufficient nexus" with Hong Kong to justify enforcement of the Hong Kong choice of law provision in the facility agreements.

[6/]The Court notes that the Hawaii Supreme Court in Airgo and Del Monte only explicitly referred to § 187(1) of the Restatement. See Airgo, 670 P.2d at 1281; Del Monte, 183 P.3d at 741. However, this district court has previously analyzed these decisions and determined that the Hawaii Supreme Court, in applying § 187, would consider both subsections (1) and (2) of § 187 of the Restatement. See Madoff v. America's Adventure, Inc., Civ. No. 12-00470 SOM/RLP, 2013 WL 6147577, at *8 (D. Haw. Nov. 21, 2013); Ingalls, 903 F. Supp. 2d at 1055-56.

issue is one which the parties could have
resolved by an explicit provision in their
agreement directed to that issue.

(2) The law of the state chosen by the
parties to govern their contractual rights
and duties will be applied, even if the
particular issue is one which the parties
could not have resolved by an explicit
provision in their agreement directed to that
issue, unless either

> (a) the chosen state has no substantial
> relationship to the parties or the
> transaction and there is no other
> reasonable basis for the parties'
> choice, or

> (b) application of the law of the chosen
> state would be contrary to a fundamental
> policy of a state which has a materially
> greater interest than the chosen state
> in the determination of the particular
> issue and which, under the rule of §
> 188, would be the state of the
> applicable law in the absence of an
> effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(1)-(2) (1971).

As an initial matter, the Court finds that § 187(1) of

the Restatement does not apply to the choice of law provision in

the facility agreements, pursuant to the Ninth Circuit's <u>Flores</u>

decision. <u>Flores v. American Seafoods Co.</u>, 335 F.3d 904, 917 (9th

Cir. 2003). The <u>Flores</u> court analyzed whether § 187(1) applied to

a commercial fishing agreement's choice of law provision

providing that the agreement "shall be governed exclusively by

the general maritime laws of the United States and applicable

United States Statues." <u>Id.</u> at 910. The Ninth Circuit found that

§ 187(1) did not apply

> because, as the Restatement explains, "The
> rule of this Subsection is a rule providing
> for incorporation by reference." <u>Id.</u> at cmt.
> c. As the illustrations accompanying that
> comment make clear, subsection (1) applies
> where the contract provides that a particular
> matter in the contract is to be governed by
> the law of the specified forum. Here, the
> agreement provided that federal maritime law
> governed the entire contract rather than the
> particular issue of attorneys' fees. Federal
> maritime law was not incorporated by
> reference as to any particular matter in the
> contract.

<u>Id.</u> at 917.

Like the contract in <u>Flores</u>, the facility agreement has
a broadly applicable choice of law provision. That provision
states that Hong Kong law governs the entire transaction rather
than any particular issue, such as claims for unfair or deceptive
practices under state statutory law. Pursuant to <u>Flores</u>, the
Court cannot apply § 187(1) of the Restatement because subsection
(1) would only apply if the choice of law provision in the
facility agreements provided that a particular matter was to be
governed by the laws of Hong Kong. <u>Compare</u> <u>Flores</u>, 335 F.3d at
917 (holding that § 187(1) does not apply to broadly applicable
choice of law provision providing that a commercial fishing
agreement was governed by federal maritime law), <u>with</u> <u>In re CMR
Mortg. Fund, LLC</u>, Bankr. No. 08-32220 TEC, 2009 WL 2870114, at *3
(N.D. Cal. Sept. 4, 2009) (finding that § 187(1) applies to
narrow choice of law provision in Co-Lender Agreement specifying

that New York law applies to matters of "construction and performance of the agreement").

Accordingly, pursuant to Hawaii choice of law principles, the Court will analyze the facility agreements' Hong Kong choice of law provision under § 187(2) of the Restatement.

**B.** **Application of Hawaii Choice of Law Principles**

**1.** **Whether the Facility Agreements' Hong Kong Choice of Law Provision Applies and Governs Plaintiffs' U.S. and Hawaii Statutory Claims**

The plain language of § 187(2) provides that the Court must apply the facility agreements' Hong Kong choice of law provision unless (1) Hong Kong has no substantial relationship to the parties or the transaction; or (2) application of Hong Kong law would be contrary to a fundamental policy of Hawaii which has a materially greater interest than Hong Kong in the determination of the issues in this case and, under § 188 of the Restatement,[7/]

_____

[7/]Section 188 of the Restatement provides, in pertinent part:

> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account. . . to determine the law applicable to an issue include:
>
>> (a) the place of contracting,
>> (b) the place of negotiation of the contract,
>> (c) the place of performance,
>> (d) the location of the subject matter of the contract, and
>> (e) the domicil, residence, nationality, place of incorporation and place of business of the [continued on next page]

Hawaii law would apply in the absence of an effective choice of law by the parties.

Notwithstanding the plain language of § 187(2), the Hawaii Supreme Court has rejected § 188 "when confronted with a conflict between the law of Hawaii and that of another state. . . ." <u>Del Monte</u>, 183 P.3d at 741; <u>see</u> <u>Mikelson v. United Servs. Auto. Assoc.</u>, 111 P.3d 601, 610 (Haw. 2005); <u>see</u> <u>also</u> <u>Ingalls</u>, 903 F. Supp. 2d at 1056.[8/]

---

        parties.

        These contacts are to be evaluated
        according to their relative importance
        with respect to the particular issue.

[8/]The Court recognizes that there are no Hawaii cases holding that § 188 does not apply when a contract contains a choice of law provision. However, in <u>Mikelson</u> and <u>Del Monte</u> where the contracts at issue did not have choice of law provisions, the Hawaii Supreme Court did not follow § 188. <u>See</u> <u>Mikelson</u>, 111 P.3d at 610; <u>Del Monte</u>, 183 P.3d at 741. Likewise, it appears that the Hawaii Supreme Court would not apply § 188 in cases where, as here, the contract contains an express choice of law provision. Indeed, as <u>Ingalls</u> notes, "other courts in outlining § 187(2)(b) have not applied the § 188 analysis in favor of considering which state has a materially greater interest." <u>Ingalls</u>, 903 F. Supp. 2d at 1056 n. 9 (citing, <u>e.g.</u>, <u>Nedlloyd Lines B.V. v. Superior Court</u>, 3 Cal. 4th 459, 466-67 (1992)).

In any event, even if § 188 was applicable to its § 187(2) analysis, the Court concludes that - under the factors set forth in § 188(2) - Hong Kong law would apply. As explained <u>infra</u>, Dominick is a Hong Kong resident; Lloyds issued and serviced the IMS loans out of its Hong Kong branch; and Plaintiffs made all payments to Lloyds' Hong Kong office. While the Court observes that the IMS loans were secured by property in Hawaii (and California), Willcox is a Hawaii resident, and Willcox appears to have signed his facility and mortgage agreements in Hawaii; these contacts do not outweigh the Hong Kong contacts previously listed. <u>See</u> Restatement § 188(2) ("These [continued on next page]

Given the Hawaii Supreme Court's rejection of § 188, this Court concludes that, pursuant to § 187(2) of the Restatement, it must apply the Hong Kong choice of law provision in the facility agreements unless (1) Hong Kong has no substantial relationship to the parties or the transaction, or (2) application of Hong Kong law would be contrary to a fundamental policy of Hawaii which has a materially greater interest than Hong Kong in the determination of the issues in this case. See Ingalls, 903 F. Supp. 2d at 1055 n. 8.[9/] The

---

contacts are to be evaluated according to their relative importance with respect to the particular issue.") Moreover, as discussed infra, the record contains no showing that Hawaii has a materially greater interest than Hong Kong in the determination of the issues arising out of the IMS loans, or that Hong Kong law is contrary to a fundamental policy of Hawaii.

[9/]In Ingalls, the court did not apply § 187(2)(a) in its choice of law analysis because the court granted the plaintiffs' motion for summary judgment on the basis of § 187(2)(b). Ingalls, 903 F. Supp. 2d at 1055 n. 8. Specifically, the Ingalls court found that California law - the law provided for in the choice law provision at issue - violated the fundamental policy of Hawaii and that Hawaii had a materially greater interest in having its law applied. Id. at 1061. However, it appears that Ingalls would have applied § 187(2)(a) had it ruled that California law had not violated the factors set forth in § 187(2)(b). Indeed, Ingalls notes that § 187(2) is written in the disjunctive; that is, a contract's choice of law provision must satisfy both requirements under § 187(2). Id. at 1055 n. 8. Accordingly, this Court will apply both subsections (a) and (b) of § 187(2).

The Court recognizes that Ingalls is in tension with Flores. In Flores, the Ninth Circuit held that to be effective, a choice of law provision "needs to satisfy only one of the two alternative requirements under section 187(2)." Flores, 335 F.3d at 918. However, Flores applied federal maritime choice of law principles. Furthermore, U.S. District [continued on next page]

-22-

facility agreements' Hong Kong choice of law provision must satisfy both requirements under § 187(2) to be effective. <u>See</u> <u>id.</u>

Under the Restatement (Second) of Conflict of Laws § 187(2)(a), Hong Kong has a substantial relationship to the parties and the IMS loan transactions: Dominick states that he is a legal resident of Hong Kong, and Lloyds issued and serviced Plaintiffs' IMS loans out of its Hong Kong branch. (<u>See</u> FAC ¶¶ 8-9; Def.'s Mot. Ex. A at 1 (listing Lloyds' address as its Hong Kong branch on the facility agreement); <u>id.</u> Ex. G at 1 (listing Lloyds' address as its Hong Kong branch on the Drawdown Instruction Form); Pls.'s Opp. Ex. 1 at 1 (mortgage agreement listing Lloyds' Hong Kong address); <u>id.</u> at 3, § 1 (mortgage agreement provision stating that all payments will be made to Lloyds at its offices in Hong Kong.) Further, the FAC alleges that Dominick visited Lloyds' Hong Kong office to "assess the viability" of his IMS loans as investments and seek advice on whether he "should keep them or dispose of them." (FAC ¶ 44.)

_____

Courts in California have followed the approach of <u>Nedlloyd Lines B.V. v. Superior Court</u>, 3 Cal. 4th 459, 466-67 (1992), which holds that choice of law provisions must satisfy both subsections (a) and (b) of § 187(2) to be operative. <u>See</u>, <u>e.g.</u>, <u>Dugan et al. v. Lloyds TSB Bank</u>, Civ. No. 3:12-cv-02549 WHA, 2014 WL 1647691, at *5 (N.D. Cal. Apr. 24, 2014) (applying both § 187(2)(a) and § 187(2)(b)).

Again, in any event, even if it applied <u>Flores</u>' § 187-2 analysis, this Court would continue to find that the Hong Kong choice of law provision in the facility agreements applies to the instant suit.

Accordingly, the Court concludes that the facility agreements'
Hong Kong choice of law provision satisfies § 187(2)(a) of the
Restatement.[10]

Next, the Court finds that the Hong Kong choice of law
provision in the facility agreements satisfies § 187(2)(b).
Specifically, the record contains no showing that Hawaii has a
materially greater interest than Hong Kong in the determination
of the issues arising out of the IMS loan transactions.
Plaintiffs argue that "Hawaii has strong policy interests in
regulating Hawaii _residential_ mortgages." (Pls.'s Opp. at 22.)
(emphasis added.) However, the IMS loans at issue in this case
are secured by non-residential mortgages: neither Willcox nor
Dominick resides at the mortgaged properties which appear to have
been purchased for investment purposes. (See FAC ¶¶ 21, 34, 44.)

---

[10]Plaintiffs appear to argue that § 187(2)(a) of the
Restatement does not apply because Hong Kong had no "substantial
relationship to the _parties_" at the time the facility agreements
were signed. (See Pls.'s Supp. Resp. at 8) (emphasis in
original.) Plaintiffs' argument is belied by the plain language
of § 187(2)(a), which provides that a contract's choice of law
provision must be applied unless "the chosen state has no
substantial relationship to the parties _or the transaction_. . ."
and contains no requirement that the "substantial relationship"
must occur at the time the contract was signed. Restatement
§ 187(2)(a) (emphasis added). While the Court observes that
Dominick appears to have executed his facility and mortgage
agreements in Tokyo and that Willcox appears to have executed his
facility and mortgage agreements in Hawaii; the FAC alleges that
Dominick is a legal resident of Hong Kong and, furthermore, the
facility and mortgage agreements indicate that the IMS loans
originated and were serviced out of Lloyds' Hong Kong office.

Plaintiffs further argue that the state of Hawaii has strong policy interests in "governing those who conduct mortgage businesses," "protecting its borrowers," and "controlling lender excesses." (Pls.'s Supp. Brief at 8.) However, Plaintiffs do not argue that these interests are <u>materially greater</u> than the interests of Hong Kong in regulating loans originating and serviced out of Hong Kong.

The record also contains no showing that Hong Kong law is contrary to a fundamental policy of Hawaii. In fact, Plaintiffs assert that the public policy underlying a similar Hong Kong law, the Unconscionable Contracts Ordinance, "parallels, rather than contradicts, the consumer protection public policy underlying [H.R.S. § 480-2]." (Pls.'s Supp. Brief at 8) (citing Doc. No. 37-3 (P. Kwan's opinion letter regarding Hong Kong law) ¶ 27.); <u>see</u> <u>also</u> <u>id.</u> at 7 ("[W]hile Hong Kong does not have a consumer protection statute like HRS Chapter 480, Hong Kong does have the Unconscionable Contracts Ordinance, which holds parties to similar standards of fairness and codifies a broad concept of unconscionability that is designed to protect mortgagors, among other consumers."); Reyes Decl. ¶ 11-13 (stating that the Hong Kong Misrepresentation Ordinance offers similar protections as the protections afforded by H.R.S. § 480-2).) Further, as Lloyds points out, application of Hong Kong law would serve a fundamental policy of Hawaii, that is, protecting

"the justified expectations of the parties." <u>Airgo</u>, 670 P.2d at
1281.

Because the Hong Kong choice of law provision in the
IMS loans' facility agreements satisfies each requirement of §
187(2) of the Restatement, the Court concludes that the facility
agreements are governed by and enforceable under the laws of Hong
Kong.

As Plaintiffs point out, however, there is an
additional choice of law provision in the mortgage agreements
stating that "[t]his Security Instrument shall be governed by the
laws of the United States of America and the laws of the State of
Hawaii." (<u>See</u>, <u>e.g.</u>, Pls.'s Opp. Ex. 1 at 7, § 15.) The parties
and the IMS loan transactions have a substantial relationship
with Hawaii because the mortgaged properties (excluding
Dominick's California property) are all located in the state of
Hawaii, Willcox is a resident of Hawaii, and Plaintiffs allege in
the FAC that Lloyds "transacts business in Hawaii" and "sold
Loans in Hawaii." (<u>See</u> FAC ¶¶ 7-9, 21-22 & 31.) Except with
respect to the choice of law provisions in the facility
agreements and promissory notes, it therefore appears that
disputes under the mortgage agreements are governed by Hawaii
law. The choice of law provision in the mortgage agreements,
however, provides that "[t]he parties acknowledge that the
Facility Agreement and the Secured Promissory Note are made and

-26-

enforceable under the laws of Hong Kong." (<u>E.g.</u>, Pls.'s Opp. Ex.
1 at 7, § 15.) The mortgagee agreements' choice of law provision
further provides that "this Security Instrument, the Facility
Agreement and the Secured Promissory Note are declared to be
severable." (<u>Id.</u>) Finally, the second paragraph of the mortgage
agreement states that interest will be paid "at the rates as
determined in the Facility Agreement." (<u>Id.</u> at 1; <u>see</u> <u>also</u> <u>id.</u> at
2 (provision in mortgage agreement noting borrower's obligation
to "pay all sums. . . at the rates referred to in the. . .
Facility Agreement.") As such, it appears that even the mortgage
agreements contemplated that the facility agreements and
promissory notes - and the interest rate provisions contained
therein - would be governed by and enforceable under Hong Kong
law.

Having concluded that the Hong Kong choice of law
provision in the facility agreements applies, the next step in
the Court's analysis is to determine whether Hong Kong law
governs Plaintiffs' U.S. and Hawaii statutory claims.

Citing this Court's decision in <u>Smallwood v. NCsoft
Corp.</u>, 730 F. Supp. 2d 1213 (D. Haw. 2010), Plaintiffs argue that
while Hong Kong law may apply to interpret the terms of the
facility agreement, Hong Kong law does not govern their U.S. and
Hawaii statutory claims. (<u>See</u> Pls.'s Supp. Brief at 4-6.)

The choice of law provision in <u>Smallwood</u> provided, in
relevant part, that a User Agreement between a consumer and
computer game manufacturer was "governed by and shall be
construed and enforced under the laws of the State of Texas." <u>Id.</u>
at 1226. This Court in <u>Smallwood</u> held that "Texas law should
determine the validity of the agreement and the limitation of
liability that appears in the agreement, but that because
Plaintiff's claims arise under Hawaii statutory and common law,
the Court will consider whether Plaintiff states a claim under
Hawaii law," including a H.R.S. Chapter 480 unfair and deceptive
practices claim. <u>Id.</u>

In reaching this holding, <u>Smallwood</u> relied extensively
on the Ninth Circuit's decision in <u>Narayan v. EGL, Inc.</u>, 616 F.3d
895 (9th Cir. 2010). The Ninth Circuit in <u>Narayan</u> found that a
similarly narrow choice of law provision - providing that the
contracts between the plaintiffs and defendant transport carrier
company "shall be interpreted under the laws of the State of
Texas" - applied only to the interpretation and enforcement of
the contracts themselves, and did not encompass the plaintiffs'
claims that they were entitled to certain employment benefits
under the California Labor Code. <u>Id.</u> at 898-99. The <u>Narayan</u>
court's reasoning was as follows:

> Under Texas law, similarly narrow choice-of-
> law clauses, providing under what law an
> agreement "shall be interpreted and
> enforced," apply only to the interpretation

-28-

and enforcement of the contract itself; they
do not "encompass all disputes between the
parties." Stier v. Reading & Bates Corp., 992
S.W.2d 423, 433 (Tex. 1999); accord Benchmark
Elecs., Inc. v. J.M. Huber Corp., 343 F.3d
719, 727 (5th Cir. 2003) (calling similar
provision "narrow"). They govern claims that
"rise or fall on the interpret[ation] and
enforce[ment] of any contractual provision."
Stier, 992 S.W.2d at 434 (internal quotations
omitted) (alterations in original); see also
Busse v. Pac. Cattle Feeding Fund # 1, Ltd.,
896 S.W.2d 807, 812-13 (Tex. App. 1995) ("The
rights, obligations, and cause of action do
not arise from the contracts but from the
Deceptive Trade Practices Act, the Texas
Securities Act, and the common law.").

The [plaintiffs'] claims involve entitlement
to benefits under the California Labor Code.
Whether the [plaintiffs] are entitled to
those benefits depends on whether they are
employees of [the transport carrier company],
which in turn depends on the definition that
the otherwise governing law – not the parties
– gives to the term "employee." While the
contracts will likely be used as evidence to
prove or disprove the statutory claims, the
claims do not arise out of the contract,
involve the interpretation of any contract
terms, or otherwise require there to be a
contract. See S.G. Borello & Sons, Inc. v.
Dep't of Indus. Relations, 48 Cal. 3d 341,
256 Cal. Rptr. 543, 769 P.2d 399, 403-07
(1989) (listing over one dozen factors
"logically pertinent to the inherently
difficult determination whether a provider of
service is an employee or an excluded
independent contractor").

. . . Similarly here, [plaintiffs'] claims
arose under the Labor Code, a California
regulatory scheme, and consequently,
California law should apply to define the
boundaries of liability under that scheme.

Id. at 898-99.

Smallwood and Narayan are distinguishable from the instant case for several reasons.

First and foremost, these cases relied on Texas law to examine the scope of their respective choice of law provisions; whereas this Court is bound to follow Hawaii choice of law rules when determining whether the facility agreements' Hong Kong choice of law provision encompasses Plaintiffs' Hawaii and U.S. statutory claims. See Welles, 503 F.3d at 738; P.W. Stephens Contractors, 805 F. Supp. at 856 (citing Klaxon, 313 U.S. at 496).

Second, the choice of law provisions at issue in Smallwood and Narayan were narrow and applied only to the "contracts" or "agreements" themselves. In this case, however, the Hong Kong choice of law provision in the facility agreements is broad and states that the entire "transaction" is governed by, or controlled by, the laws of Hong Kong.

Finally, as indicated above, Smallwood found that the plaintiff's H.R.S. Chapter 480 unfair and deceptive practices claim did not "rise or fall on the interpretation and enforcement of any contractual provision." Smallwood, 730 F. Supp. at 1226 (citing Narayan, 616 F.3d at 899). Similarly, Narayan found that "[w]hile the contracts will likely be used as evidence to prove or disprove the [California] statutory claims, the claims do not arise out of the contract, involve the interpretation of any

contract terms, or otherwise require there to be a contract."
Narayan, 616 F.3d at 899.

Here, Plaintiffs' H.R.S. Chapter 480 claim is based on allegations that Lloyds committed unfair and deceptive business practices by

> a. [d]eceiving consumers into entering into variable <u>interest rate</u>, variable currency loans with virtually unlimited risk of liability, by promising a low <u>interest rate</u> tied to Lloyds' actual <u>Cost of Funds</u>;
>
> b. [m]aking loans with an unknown, variable <u>interest rate</u> that Lloyds intended to raise drastically following the close of the transaction, or arbitrarily raised drastically thereafter. . . . ;
>
> c. [c]oncealing its intent behind raising the <u>interest rates</u> over time, as reflected in its complete divergence from comparable indexes and interest rates and its complete failure to disclose how Lloyds calculated its internal "<u>Cost of Funds</u>." . . . ; and
>
> d. [u]sing the dramatically increasing <u>interest rates</u> to take advantage of borrowers such as Plaintiffs and the Class by declaring them in default and demanding additional deposits or collateral, or threatening other legal action.

(FAC ¶ 64 (emphasis added).)

Further, Plaintiffs' claim for declaratory relief – made pursuant to H.R.S. §§ 632-1, <u>et seq.</u>, and 28 U.S.C. §§ 2201 and 2202 – seeks a declaratory judgment that the interest on their IMS loans "should not accrue at a per annum rate of greater than 1.5% plus Lloyds' actual Cost of Funds," which "will serve

to terminate the uncertainty or controversy regarding the parties' divergent interpretations of their rights and duties regarding the Cost of Funds." (FAC ¶¶ 73 & 77.)

Unlike the claims in Smallwood and Narayan, Plaintiffs' H.R.S. Chapter 480 and declaratory relief claims rise or fall on the interpretation and enforcement of the IMS loans' interest rate provisions and the "Cost of Funds" definition contained therein. The facility agreement - and apparently the promissory note[11] - are the only documents in which the interest rate provisions and the Cost of Funds definition appears, and both explicitly provide that "the transaction shall be governed by the laws of Hong Kong." (E.g., Def.'s Mot. Ex. A at 7.) In other words, Plaintiffs' claims arise out of the interest rate provisions, including the Cost of Funds definition, in the facility agreements. Consequently, any analysis of Plaintiffs'

_____

[11]Neither party has provided the Court with copies of the promissory notes executed by Willcox and Dominick. However, as indicated supra, the choice of law provision in the mortgage agreements states that "the Secured Promissory Note [is] made and enforceable under the laws of Hong Kong." (E.g., Pls.'s Opp. Ex. 1 at 7, § 15.); see also P. Kwan Decl. ¶ 4(b) (noting that the promissory note contains the following choice of law provision: "This Security Agreement shall be governed by and construed in accordance with the laws of Hong Kong.").) Moreover, in Dugan et al. v. Lloyds TSB Bank, Civ. No. 3:12-cv-02549 WHA, 2014 WL 1647691, at * 6 (N.D. Cal. Apr. 24, 2014), a factually similar case involving allegations by IMS loan borrowers that Lloyds arbitrarily raised the interest rate contractually tied to the Cost of Funds, the court noted that the facility agreement and promissory note at issue in that case were the only documents in which the Cost of Funds definition appeared.

Hawaii and U.S. statutory claims will involve the interpretation of the terms of the facility agreement; which terms are governed by and enforceable under Hong Kong law.

Notwithstanding Plaintiffs' arguments to the contrary, the choice of law provision in the facility agreements is broad and reflects the parties' clear contemplation that the "transaction" is to be "governed by" Hong Kong law. No exceptions are provided. The "transaction" to be governed by Hong Kong law is effectuated by the facility agreement, under which Lloyds agreed to loan Plaintiffs certain sums of money, and Plaintiffs agreed to pay interest in the amounts set forth in the facility agreements until the IMS loan was paid off. The facility agreements expressly set forth that the interest rate will be calculated at 1.5% per annum above the Bank's Cost of Funds (as defined) with the interest period fixed for successive three month periods. Thus, the facility agreements clearly contemplate the interest rate will be reviewed every three months and adjusted from time to time when certain costs change. Plaintiffs assert while certain cost changes were contemplated from time to time over the course of the loan pursuant to the Cost of Funds provision, Lloyds misrepresented and wrongly increased the interest rates. It follows that the interest rate changes over the course of the loan all had a logical relationship as they were contemplated by, and determined under, the Cost of Funds

provision as cost changes occurred during certain three month
fixed interest periods. Accordingly, the alleged wrongful
interest rate changes, and Plaintiffs' claims regarding them, all
fall under the transaction in the choice of law provision.[12/]

In view of the foregoing, the Court finds the facility
agreements' Hong Kong choice of law provision applies and governs
Plaintiffs' U.S. and Hawaii statutory claims.

### 2. Whether Hong Kong Law Precludes Plaintiffs' U.S. and Hawaii Statutory Claims

Even though the Court finds that the facility
agreements' Hong Kong choice of law provision applies and

---

[12/]Plaintiffs submitted the expert opinion of Paul Kwan
regarding Hong Kong law. Kwan argues that the word "transaction"
is ambiguous and pursuant to Hong Kong law should be construed
against Lloyds, as drafter of the facility agreements. (P. Kwan
Decl. ¶¶ 8(e)-(f).) Although the facility agreement does not
define "transaction;" the Court finds, as set forth above, that
under the context of the choice of law provision and the interest
rate being calculated at 1.5% per annum above the Cost of Funds
with the interest period fixed for successive three month periods
as stated in the facility agreement, as well as other provisions
therein, the word "transaction" is not ambiguous. "The Supreme
Court has opined that: 'transaction' is a word of flexible
meaning. It may comprehend a series of many occurrences,
depending not so much upon the immediateness of their connection
as upon their logical relationship." In re Madigan, 270 B.R. 749,
755 (B.A.P. 9th Cir. 2001) (citing Moore v. New York Cotton
Exchange, 270 U.S. 593, 610 (1926) (internal quotation mark and
alteration omitted)); see also Baker v. Gold Seal Liquors, Inc.,
417 U.S. 467, 469 n. 1 (1974) (noting "transaction is a word of
flexible meaning which may comprehend a series of occurrences if
they have logical connection. . .") (citing to Moore).

governs, the Court must still consider whether Hong Kong law

precludes Plaintiffs' Hawaii and federal statutory claims.[13]/

---

[13]/Citing various decisions from U.S. District Courts in
California, Lloyds argues that reference to Hong Kong law is not
required to reach the "obvious conclusion" that statutory
provisions arising exclusively under U.S. and Hawaii law are
barred by the Hong Kong choice of law provision. See, e.g., Abat
v. Chase Bank USA, N.A., 738 F. Supp. 2d 1093, 1096 (S.D. Cal.
2010) ("The choice of law provision should be enforced, and its
selection of Delaware law bars Plaintiff's California statutory
claims as a matter of law."); Mediamatch, Inc. v. Lucent Techs.
Inc., 120 F. Supp. 2d 842, 862 (N.D. Cal. 2000) ("Because the law
is so clearly in favor of enforcing the [New Jersey] choice-of-
law provisions of the contracts, the Court will not address the
purely hypothetical question of whether plaintiffs have alleged
sufficient facts to meet the pleading standard for the
[California] UCL.").

Pursuant to these decisions, it appears that if a choice of
law provision selects the law of one state to apply, then a
plaintiff cannot assert statutory claims under the law of any
other state. Cases from jurisdictions outside the Ninth Circuit
have held similarly. See, e.g., Burger King Corp. v. Weaver, 169
F.3d 1310, 1318 (11th Cir. 1999) (upholding district court's
determination that the Montana Unfair Deceptive Trade Practices
Act "is inapplicable to a lawsuit construed in accordance with
the laws of Florida"); Midland Mgmt., LLC v. Burger King Corp.,
217 F. Supp. 2d 1261, 1264 (S.D. Fla. 2001) ("Therefore,
Plaintiff Midland's claims based upon California statutes are
inapplicable to the dispute arising from the Franchise Agreement
to be construed in accordance with Florida law."); Cottman
Transmission Systems, LLC v. Kershner, 492 F. Supp. 2d 461, 472
(E.D. Pa. 2007) ("This decision is in accord with the decisions
of other federal district courts in Pennsylvania that have held
that a claim under an out-of-state consumer protection statute
may not be asserted when the parties have contractually agreed
that Pennsylvania law applies to their relationship.").

In this case, however, the Court has applied Hawaii choice
of law principles and determined that Hong Kong law should govern
whether or not Plaintiffs' Hawaii and federal statutory claims
are precluded. These laws are not the same as those applied in
the above cases cited in this footnote. Accordingly, the Court
will not consider these decisions.

Here, Lloyds submits the expert opinion of Professor
Anselmo Reyes, a former Hong Kong High Court judge. Reyes opines
that the application of Hong Kong law precludes the assertion of
Plaintiffs' U.S. and Hawaii statutory claims because the body of
Hong Kong law includes, inter alia, acts of the Hong Kong
legislature and English common law but expressly does not include
foreign statutes. (Reyes Decl. ¶¶ 7 & 9.) According to Reyes,
Hong Kong courts "will not apply foreign case law or statutes
since those laws do not form part of Hong Kong law." (Id. ¶ 7)
(citing Palace Hotel Ltd. v. Owners of the Ship or Vessel Happy
Pioneer, [1982] 1 H.K.C. 640, 645-46 (H.C.) (Def.'s Supp. Brief
Ex. C) ("I cannot accept Mr. Tong's submission as to the effect
of the statement in the preamble of the American Act [Carriage of
Goods by Sea Act or "COGSA"]. Its result, if it was accepted,
would be that an American statute would be given the force of law
in the courts of this colony. . . . I do not accede to the
submission that a statement in a foreign statute can, as a matter
of law, bind the Hong Kong court to regard that statute as the
governing law of the contract.")); and Winnie Lo v. HKSAR, [2012]
H.K.C.U. 416, at ¶ 98 (C.F.A.) (Def.'s Supp. Brief Ex. E.) ("If
any doctrine of desuetude exists under Hong Kong law, it can only
exist as a doctrine of the common law made applicable by Article
8 of the Basic Law. It is the common law which derives from
English common law as received in Hong Kong, not Scots law, not

-36-

South African Roman-Dutch law and not the law of West Virginia. . . . No such doctrine has been made applicable in Hong Kong by the Basic Law.").)

In opposition, Plaintiffs submit the expert opinion of Paul Kwan, a partner at a Hong Kong-based law firm. Kwan opines, inter alia, that there are no Hong Kong authorities that would preclude a party from asserting a non-contractual claim under a foreign statute in a foreign court. (P. Kwan Decl. ¶ 24.) According to Kwan, if a statute "confers a right of action which is independent of the contract itself, then [] the choice of law clause in the contract would [not] affect the applicability of that statute." (Id.) Kwan further opines that because Plaintiffs' claims "sound in restitution" under Hong Kong law, the law with the "closest and most real connection" should govern. (Id. ¶¶ 13-21.) As such, Kwan concludes that Hawaii law should govern given that, among other things, the IMS loans were marketed to Hawaii residents and secured by property located in Hawaii. (Id. ¶¶ 16 & 21.)

The Court recognizes that the expert opinions submitted by the parties conflict over whether the application of Hong Kong law precludes Plaintiffs' Hawaii and U.S. statutory claims. Nevertheless, after carefully reviewing the expert opinions and the exhibits attached thereto (in addition to the parties'

supplemental briefing), the Court concludes that the expert opinion of Reyes is more persuasive.

Among other bases, Kwan opines that - under Hong Kong law - a choice of law provision in a contract would not affect the applicability of a statute if the statute confers a right of action independent of the contract itself. (P. Kwan Decl. ¶ 24.) However, as discussed in detail <u>supra</u>, Plaintiffs' H.R.S. Chapter 480 and declaratory relief claims - made pursuant to H.R.S. §§ 632-1, <u>et</u> <u>seq.</u>, and 28 U.S.C. §§ 2201 and 2202 - arise directly out of the facility agreements and specifically the Cost of Funds definition provision contained therein. <u>Contra</u> <u>Narayan</u>, 616 F.3d at 899 (holding that "[w]hile the contracts will likely be used as evidence to prove or disprove the [California] statutory claims, the claims do not arise out of the contract, involve the interpretation of any contract terms, or otherwise require there to be a contract").

Further, Kwan opines that Hawaii law should control the instant dispute because Plaintiffs' claims sound in restitution under Hong Kong law; and Hong Kong law provides that the law of the state with the closest and most real connection should govern. (P. Kwan Decl. ¶¶ 13-21.) Kwan's reasoning may apply in the <u>absence</u> of an express choice of law provision; however, as Reyes notes in his expert opinion, "[w]here the parties have provided for Hong Kong law to govern, [] Hong Kong [c]ourt[s]

will generally give effect to the parties' express choice of Hong Kong law as the proper law of their transaction." (Reyes Decl. ¶ 6) (citing <u>Tzortzis v. Monark Line</u> [1968] 1 W.L.R. 406, 411 (C.A.) (Def.'s Supp Brief Ex. F) ("It is clear that, if there is an express clause in a contract providing what the proper law is to be, that is conclusive in the absence of some public policy to the contrary.") As such, Reyes opines, Hong Kong courts will "apply Hong Kong law to the preclusion of foreign law" and "Hong Kong law will accordingly determine questions such as the material or essential validity of the contract, the interpretation and effect of the contract, the discharge of the contract, and all other claims arising out of the parties' transaction." (<u>Id.</u>)

Plaintiffs attempt to distinguish <u>Tzortzis</u>, the case relied upon by Reyes in reaching his opinion that an express Hong Kong choice of law provision will be given effect to the preclusion of foreign law. Specifically, Plaintiffs argue that <u>Tzortzis</u> (1) did not involve an express choice of law clause and (2) indicates that a contract's forum selection clause is relevant to understanding the parties' intent regarding applicable law. (Pls.'s Supp. Resp. at 6-7.)

Although this Court observes that <u>Tzortzis</u> involved an arbitration clause providing that "any dispute in connection with the contract should be decided by arbitration in the City of

London"; Reyes cited the case because it contains dicta that - under Hong Kong law - an express choice of law clause will be enforced absent some public policy to the contrary. <u>See</u> <u>Tzortzis</u> 1 W.L.R. at 411.

Regarding Plaintiffs' second argument, the facility agreements provide that "the parties hereto agree to submit to the non-exclusive jurisdiction of the courts of Hong Kong." (<u>E.g.</u>, Def.'s Mot. Ex. A at 7.) Here, Lloyds does not argue that Hawaii is an inappropriate forum to address Lloyds' alleged misrepresentations and other wrongdoing. Rather, Lloyds argues that the operation of the Hong Kong choice of law provision in the facility agreements effectively precludes Plaintiffs from asserting claims under U.S. and Hawaii statutory law based on allegations that Lloyds violated the interest rate provisions of the facility agreements. Moreover, the non-exclusive forum selection clause in the facility agreements does not override enforcement of the choice of law provision in the facility agreement, which is broad and reflects the parties' clear contemplation that the "transaction" is to be "governed by," or controlled by, Hong Kong law.

Additionally, Kwan opines that there is no Hong Kong authority that bars Plaintiffs from asserting claims under U.S. and Hawaii statutory law in a foreign court. (P. Kwan Decl. ¶ 24.) However, Reyes provides two Hong Kong cases - <u>Palace Hotel</u>

and <u>Winnie Lo</u> - that appear to indicate that Hong Kong courts

will not apply U.S. or Hawaii statutory law. (Reyes Decl. ¶ 7.)

   <u>Palace Hotel</u> involved a choice of law provision in a

bill of lading providing that "the Law of the Netherlands. . .

shall apply to this contract." <u>Palace Hotel</u>, 1 H.K.C. at 642.

The bill of lading also included a "jurisdiction clause"

providing that "[a]ll actions under the present contract of

carriage shall be brought before the court at Amsterdam, and no

other court shall have jurisdiction." <u>Id.</u> In <u>Palace Hotel</u>, the

plaintiffs, cargo owners, filed suit against the defendants,

owners of the vessel "Happy Pioneer," for failure to deliver the

goods in accordance with the bill of lading. <u>Id.</u> at 641. The

<u>Palace Hotel</u> plaintiffs brought suit in Hong Kong, despite the

choice of law provision and jurisdiction clause in the bill of

lading, and the defendant sought to have the Hong Kong suit

stayed. <u>Id.</u> at 643. The High Court of Hong Kong ultimately

granted the stay, effectively allowing the action to proceed in

the Netherlands. <u>Id.</u> at 649.

   Plaintiffs attempt to negate Lloyds' reliance on <u>Palace</u>

<u>Hotel</u>.[14/] Specifically, Plaintiffs argue that <u>Palace Hotel</u>

demonstrates that "Hong Kong courts will not be bothered where

_____

   [14/]Plaintiffs do not attempt to distinguish <u>Winnie Lo</u> from
the instant case. (<u>See</u> Pls.'s Supp. Resp. at 4 n. 4.) Rather,
Plaintiffs merely state that <u>Winnie Lo</u> provides a "general
proposition" that the body of Hong Kong law does not include
foreign statutes. <u>See</u> <u>Winnie Lo</u>, H.K.C.U. 416, at ¶ 98.

the parties have selected another jurisdiction to resolve the
disputes." (Pls.'s Supp. Resp. at 6.) However, contrary to
Plaintiffs' assertion, Palace Hotel appears to indicate that Hong
Kong courts will give full effect to an express choice of law
provision. See Palace Hotel, 1 H.K.C. at 648 (noting "that the
law of the Netherlands is the proper law of the contract and
[thus] would clearly be best applied by the court at Amsterdam.")
Moreover, as noted in Reyes' expert opinion, Palace Hotel
suggests that the body of Hong Kong law does not include foreign
statutes. See id. at 646 (in response to Mr. Tong's [counsel for
plaintiff] argument "that an examination of the [clause in the
bill of lading stating that COGSA governed] show[s] that United
States law was a proper law of the contract," the High Court
Judge ruled that "I cannot accept Mr. Tong's submission as to the
effect of the statement in the preamble of the American Act
[COGSA]. Its result, if it was accepted, would be that an
American statute would be given the force of law in the courts of
this colony. . . . I do not accede to the submission that a
statement in a foreign statute can, as a matter of law, bind the
Hong Kong court to regard that statute as the governing law of
the contract.")[15/]

---

[15/]Reyes refers to this ruling as "dicta." (Reyes Decl. ¶ 7.)
However, it appears that the ruling was essential to the court's
determination that the Law of Netherlands - and not American law
- was the proper law of the contract. See Palace Hotel, 1 H.K.C.
at 644-47; see also id. at 640 (headnote [continued on next page]

Based on the foregoing analysis, the Court is persuaded that - pursuant to Reyes' expert opinion - Hong Kong law not only gives full effect to the parties' choice of law provision, but also precludes Plaintiffs' assertion of U.S. and Hawaii statutory claims.

This Court's holding that the application of Hong Kong law precludes the assertion of Plaintiffs' Hawaii and U.S. statutory claims is further supported by Judge Alsup's very recent opinion in Dugan et al. v. Lloyds TSB Bank, Civ. No. 3:12-cv-02549-WHA, 2014 WL 1647691, at *4-6 (N.D. Cal. Apr. 24, 2014). (See Note 1 supra.) Like the instant case, the plaintiffs in Dugan were IMS loan borrowers of Lloyds who alleged that Lloyds arbitrarily and deceptively raised the interest rate

---

providing that "[i]t was contended that American law was the proper law of the contract as a clause in the bill of lading stated COGSA applied").

Similarly, Reyes refers to a ruling in Winnie Lo as "dicta." (Reyes Decl. ¶ 7)(citing Winnie Lo, H.K.C.U. 416, at ¶ 98).) Again, it appears that this ruling was not dicta. See Winnie Lo, H.K.C.U. 416, at ¶ 85 ("The appellant seeks to contend that the doctrine of desuetude applies to abrogate maintenance as a criminal offence."); ¶ 97 ("Finally, the appellant's argument leans heavily on" West Virginia law which recognizes the desuetude doctrine.); ¶ 98 (rejecting appellant's reliance on the desuetude doctrine because Hong Kong law does not recognize West Virginia law).)

In any event, the Court notes that one of the definitions of "dictum" in Black's Law Dictionary is "[a] statement of opinion or belief considered authoritative because of the dignity of the person making it"). Black's Law Dictionary, 9th Ed. p. 519 (2009). Perhaps this was the meaning intended by Reyes.

contractually tied to Lloyds' Cost of Funds, even though

comparable indexes and interest rates were falling. Id. at *1.

The Dugan plaintiffs executed facility agreements containing a

Hong Kong choice of law provision virtually identical to the one

at issue in this case, providing that "the laws of Hong Kong

shall govern this transaction." Id. at *4. After determining that

the Hong Kong choice of law provision was enforceable pursuant to

California choice of law principles,[16/] Judge Alsup held that the

_____

[16/]Although California courts also apply the principles set
forth in § 187 of the Restatement, the California choice of law
analysis is slightly different from Hawaii's choice of law
analysis. See Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th
459, 466-67 (1992). Nedlloyd outlines the California approach for
determining the enforceability of a choice of law provision:

> [T]he court [must first] determine either:
> (1) whether the chosen state has a
> substantial relationship to the parties or
> their transaction, or (2) whether there is
> any other reasonable basis for the parties'
> choice of law. If neither of these tests is
> met, that is the end of the inquiry, and the
> court need not enforce the parties' choice of
> law. If, however, either test is met, the
> court must next determine whether the chosen
> state's law is contrary to a fundamental
> policy of California. If there is no such
> conflict, the court shall enforce the
> parties' choice of law. If, however, there is
> a fundamental conflict with California law,
> the court must then determine whether
> California has a "materially greater interest
> than the chosen state in the determination of
> the particular issue. . . ." If California
> has a materially greater interest than the
> chosen state, the choice of law shall not be
> enforced, for the obvious reason that in such
> circumstance we will decline to enforce a law
> contrary to this [continued on next page]

Hong Kong choice of law provision precluded plaintiffs from asserting a statutory claim for violation of California's Unfair Competition Law ("UCL"). Id. at *4-6. Judge Alsup's holding was based in large part on a determination that the parties contemplated using Hong Kong law for any disputes arising from the Cost of Funds provision in the facility agreements. See id. at *5-6.

Likewise here, this Court finds that Willcox and Dominick are sophisticated real estate investors who contemplated that the interest rate provisions of the facility agreements - including the Cost of Funds definition - would be "governed by the laws of Hong Kong," and, therefore, they could only bring claims under Hong Kong law for any disputes arising out of those interest rate provisions.

This Court's determination that application of Hong Kong law precludes Plaintiffs' assertion of claims under Hawaii and U.S. statutory law does not leave Plaintiffs (and those similarly-situated) without alternative remedies to address Lloyds' alleged misrepresentations and other wrongdoing. Both parties submit that several Hong Kong statutes and common law remedies are available and offer somewhat similar protection to consumers as the subject Hawaii and U.S. statutes. (See, e.g.,

---

state's fundamental policy.

Id. at 466 (emphasis in original).

Reyes Decl. ¶¶ 9-13 (stating that Hong Kong law recognizes, inter alia, a common law action for fraudulent misrepresentation and a statutory cause of action for negligent misrepresentation under the Misrepresentation Ordinance); Pls.'s Supp. Brief at 7 ("Hong Kong law has one statute and [several] common law claims that might, in combination, roughly approximate the nature of a Chapter 480 claim or a declaratory action."); P. Kwan Decl. ¶ 27 ("To this extent, [the Unconscionable Contracts Ordinance] appears to bear some similarity to [Plaintiffs'] claim[s] brought under the subject US/Hawaii statutes and the reliefs sought thereunder.")

Accordingly, the Court finds that the facility agreements' Hong Kong choice of law provision precludes Plaintiffs' assertion of Hawaii and U.S. statutory claims.[17] Consequently, the Court DISMISSES without prejudice Plaintiffs' H.R.S. Chapter 480 unfair and deceptive trade practices claim, and claim for declaratory relief under H.R.S. §§ 632-1, et seq., and 28 U.S.C. §§ 2201 and 2202. Plaintiffs are granted leave to amend the FAC in conformity with this Order.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court:

---

[17]Because the Court concludes that the facility agreements' Hong Kong choice of law provision controls and bars Plaintiffs' Hawaii and federal statutory claims, it is not necessary to address Lloyds' other arguments for dismissing the claims in the FAC.

-46-

(1) GRANTS Defendant's Motion to Dismiss with respect to Plaintiffs' unfair and deceptive trade practices claim under H.R.S. §§ 480-2 and 481A-3(a)(12); and

(2) GRANTS Defendant's Motion to Dismiss with respect to Plaintiffs' declaratory relief claim under H.R.S. §§ 632-1, <u>et seq.</u>, and 28 U.S.C. §§ 2201 and 2202.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, June 10, 2014.



_____
Alan C. Kay
Senior United States District Judge