IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

|  |  |
|---|---|
| BRADLEY WILLCOX and FRANK DOMINICK,<br><br>        Plaintiffs,<br><br>     vs.<br><br>LLOYDS TSB BANK, PLC, a bank organized and existing under the laws of the United Kingdom, and DOES 1-15,<br><br>        Defendants. | Civ. No. 13-00508 ACK-RLP |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

### PROCEDURAL BACKGROUND

On September 13, 2013, Plaintiff Bradley Willcox filed a Complaint, on behalf of himself and a similarly situated class, against Defendant Lloyds TSB Bank, PLC, now known as Lloyds Bank PLC ("Lloyds"), in the Circuit Court of the First Circuit, State of Hawaii. (Doc. No. 1 ("Notice of Removal") Ex. A.) On October 7, 2013, Lloyds removed the case to federal court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332.[1] (Notice of Removal

---

[1]Three class action suits involving similar loan products and claims as those at issue in the instant case have been filed against Lloyds in federal district courts in California and Washington: (1) Dugan v. Lloyds TSB Bank, Civ. No. 3:12-cv-02549-WHA (N.D. Cal.); (2) Osmena v. Lloyds TSB Bank, Civ. No. 3:12-cv-
(continued...)

1

at 3-7.)

On December 3, 2013, Willcox filed a First Amended
Complaint ("FAC"), adding Frank Dominick as a named plaintiff.
(Doc. No. 25.) Willcox and Dominick (collectively "Plaintiffs")
brought two claims for relief in their FAC: Unfair and Deceptive
Trade Practices under H.R.S. §§ 480-2 and 481A-3(a)(12); and
Declaratory Relief under H.R.S. §§ 632-1 et seq. and 28 U.S.C. §§
2201 and 2202. (FAC ¶¶ 61-77.)

On December 17, 2013, Lloyds filed a Motion to Dismiss
the Claims Asserted in the FAC. (Doc. No. 26.) On June 10, 2014,
the Court issued an Order Granting Lloyds' Motion to Dismiss.
(Doc. No. 49 ("June 10 Order").) In the June 10 Order, the Court
found that the facility agreements' Hong Kong choice of law
provision precluded Plaintiffs from asserting Hawaii and U.S.
statutory claims and, therefore, dismissed all claims in the FAC.
June 10 Order at 46. However, the Court granted Plaintiffs leave
to file an amended complaint. Id.

On August 14, 2014, Plaintiffs filed the operative
Second Amended Complaint ("SAC"). (Doc. No. 61.) In their SAC,
Plaintiffs bring three claims for relief under Hong Kong law:
Breach of Contract (Count I); Breach of an Implied Term Limiting

---

[1]/(...continued)
02937-WHA (N.D. Cal.) (since consolidated with Dugan); and (3)
Washington Land Development, LLC v. Lloyds TSB Bank plc, 2:14-cv-
00179-JCC (W.D. Wash.). Dugan and Osmena have since been resolved
and dismissed.

Lloyds' Discretion to Change the Interest Rate (Count II); and

Declaratory Relief (Count III). (<u>Id.</u> ¶¶ 54-78.)

On September 19, 2014, Lloyds filed the instant Motion

to Dismiss the Claims Asserted in the SAC (Doc. No. 62), along

with a Notice of Intent to Rely on Foreign Law Pursuant to

Federal Rule of Civil Procedure 44.1 (Doc. No. 63). On November

24, 2014, Plaintiffs filed an Opposition (Doc. No. 68), along

with a Notice of Intent to Rely on Foreign Law Pursuant to

Federal Rule of Civil Procedure 44.1 (Doc. No. 67). On December

1, 2014, Lloyds filed a Reply. (Doc. No. 69.)

The Court held a hearing regarding the instant motion

on December 15, 2014.

## FACTUAL BACKGROUND[2]

This case involves the issuance by Lloyds of dual

currency, or International Mortgage System ("IMS"), loans. Lloyds

is a wholly-owned subsidiary of Lloyds Banking Group, PLC. (SAC ¶

8.) Lloyds is organized under the laws of the United Kingdom and,

although a subsidiary, maintains branches throughout the world,

including a branch in Hong Kong, through which Lloyds issued IMS

loans to Plaintiffs. (<u>Id.</u>) Lloyds obtains funding from its

parent.

---

[2] The facts as recited in this Order are for the purpose of
disposing of the current motion and are not to be construed as
findings of fact that the parties may rely on in future
proceedings.

I.        **The "Cost of Funds" Provision in the IMS Loans**

IMS loans are mortgage loans with a currency switching feature that allows borrowers to switch the currency of their loans between U.S. Dollars and other currencies. This case concerns IMS loans secured by mortgages on real property located in Hawaii and California. (<u>Id.</u> ¶¶ 6-7 & 28-29.) These loans all have an interest rate set at 1.5% above the "Cost of Funds," with the interest rate period fixed for successive three month periods. The Cost of Funds is defined as "the cost (calculated to include the costs of complying with liquidity and reserve asset requirements) in respect of any currency expressed as a percentage rate of funding for maintaining the Advance or Advances in that currency as conclusively nominated by the Bank from time to time." (<u>Id.</u> ¶ 2.)

II.       **The Named Plaintiffs' Loans**

Plaintiff Bradley Willcox is a resident of Hawaii and Canadian citizen who, in 2007, took out approximately $1,284,500 in four IMS loans from Lloyds, secured by four real properties located in Honolulu, Hawaii. (SAC ¶¶ 6 & 20-21; Mot. at 6.) Willcox took out the loans in U.S. Dollars and, shortly after the closing of the transaction, chose to redenominate them to Japanese Yen. (SAC ¶ 22.) After he did so, the exchange rate began to fall, meaning the Yen grew stronger relative to the U.S. Dollar, and the interest rate on Willcox's loans rose. (<u>Id.</u> ¶

4

23.) Willcox alleges that the "dramatic increase" was a product, in part, of Lloyds' "arbitrary increases" in its Cost of Funds. (<u>Id.</u> ¶ 24.) Willcox states that, as a result of these alleged arbitrary increases, he has paid substantially more than he otherwise would have over the course of the loans. (<u>Id.</u> ¶ 25.)

Plaintiff Frank Dominick is a legal resident of Hong Kong[3/] and a U.S. citizen. (<u>Id.</u> ¶ 7.) In 2007, Dominick took out $2,700,000 in an IMS loan from Lloyds, secured by property located in Honolulu, Hawaii, as well as a second IMS loan for $1,762,500 secured by a property in Los Angeles, California. (<u>Id.</u> ¶¶ 27-29.) Dominick alleges that his loans were always denominated in Yen. (<u>Id.</u> ¶ 29.) Lloyds asserts that Dominick chose to denote his loans in Yen, and notes that the facility agreements governing Dominick's loans set forth the loan amounts in U.S. Dollars. (Mot. Exs. E & F.) Regardless, as was the case for Willcox, once the exchange rate began to drop (with the Yen growing stronger in relation to the U.S. Dollar), Dominick's interest rate on his loans rose. (SAC ¶ 31.) Dominick alleges that his quarterly interest payments had risen "dramatically" by 2012. (<u>Id.</u>) Specifically, Dominick alleges that his payments on the Hawaii property loan in March 2007 were equivalent to

---

[3/]As discussed below, Dominick asserts in his declaration that although he is "technically" a legal resident of Hong Kong, he resides primarily in California. <u>See</u> Part I.B.2.a. of this Order <u>infra</u>.

approximately $15,800 in U.S. Dollars, but that the payments had increased to roughly the equivalent of $28,300 by September 2012. (<u>Id.</u> ¶ 32.) Dominick alleges that this increase was the result of Lloyds' arbitrary increases of its Cost of Funds. (<u>Id.</u> ¶ 33.) According to Dominick, he has paid significantly more money over the course of the loans than he otherwise would have as a result of Lloyds' increase in its Cost of Funds. (<u>Id.</u> ¶ 34.)

**III.     Allegations Regarding the Cost of Funds**

Plaintiffs allege that Lloyds arbitrarily increased the Cost of Funds component of the variable interest rates of the IMS loans thereby substantially increasing the IMS loans' interest rates. (<u>Id.</u> ¶ 4.) Plaintiffs further allege that Lloyds increased its Cost of Funds during a time when standard indexes for interest rates, such as the London Inter-Bank Offered Rate ("LIBOR"), decreased. (<u>Id.</u>)

Plaintiffs assert that, from 1985 to 2008, Lloyds used one method for calculating its Cost of Funds, but that in 2009 Lloyds added several basis points to the Cost of Funds as a result of the imposition by its parent company of a liquidity transfer pricing ("LTP") charge. (<u>Id.</u> ¶ 5.) Plaintiffs allege that Lloyds thus used the Cost of Funds to pass on to borrowers "the cost of funding Lloyds' parent's overhead and operations as a whole, not just the cost of funding their own IMS loans." (<u>Id.</u>)

## DISCUSSION

Lloyds moves to dismiss the SAC on *forum non conveniens* grounds. Alternatively, Lloyds moves to dismiss the SAC for failure to state a claim upon which relief can be granted.

### I.     Motion to Dismiss for *Forum Non Conveniens*

#### A. Legal Standard

"The doctrine of *forum non conveniens* is a drastic exercise of the court's 'inherent power' because, unlike a mere transfer of venue, it results in the dismissal of a plaintiff's case." <u>Carijano v. Occidental Petroleum Corp.</u>, 643 F.3d 1216, 1224 (9th Cir. 2011). Accordingly, the Ninth Circuit has "treated *forum non conveniens* as 'an exceptional tool to be employed sparingly,' and not a 'doctrine that compels plaintiffs to choose the optimal forum for their claim.'" <u>Id.</u> (quoting <u>Dole Food Co. v. Watts</u>, 303 F.3d 1104, 1118 (9th Cir. 2002)). "The mere fact that a case involves conduct . . . from overseas is not enough for dismissal." <u>Id.</u> (citing <u>Tuazon v. R.J. Reynolds Tobacco Co.</u>, 433 F.3d 1163, 1181-82 (9th Cir. 2006)).

"To prevail on a motion to dismiss based upon *forum non conveniens*, a defendant bears the burden of demonstrating an adequate alternative forum, and that the balance of private and public factors favors dismissal." <u>Id.</u> (citing <u>Dole Food Co.</u>, 303 F.3d at 1118).

#### B. Application

7

## 1. Adequate Alternative Forum

"Generally, an alternative forum is available where the defendant is amenable to service of process and the forum provides 'some remedy' for the wrong at issue." Tuazon, 433 F.3d at 1178.

Here, it appears that Lloyds is amenable to service of process in Hong Kong because it currently maintains a branch in Hong Kong and conducts business there. Furthermore, it is clear that Hong Kong courts provide Plaintiffs "some remedy" for Lloyds' alleged wrongful conduct given that they assert claims and seek relief under Hong Kong law. Tuazon, 433 F.3d at 1178; see also Borden, Inc. v. Meiji Milk Products Co., Ltd., 919 F.2d 822, 829 (2d Cir. 1990) (holding that a foreign forum was adequate even though it did not "provide precisely the same remedies" as a United States court). The Court also notes that the IMS loans' facility agreements contain a Hong Kong choice of law provision and non-exclusive Hong Kong forum selection clause. (See, e.g., Mot. Ex. A at 7.)[4] Moreover, in its June 10 Order, the Court recognized that "several Hong Kong statutes and common law remedies" offer Plaintiffs "somewhat similar protection" as

---

[4] For purposes of ruling on Defendant's motion to dismiss for _forum non conveniens_, the Court considers materials outside the SAC. See Van Cauwenberghe v. Biard, 486 U.S. 517, 529 (1988) (recognizing that "the district court is accorded substantial flexibility in evaluating a _forum non conveniens_ motion, and each case turns on its facts") (internal citation and alteration omitted).

certain U.S. and Hawaii consumer protection statutes. June 10 Order at 45-46.

For these reasons, the Court concludes that Hong Kong is an adequate alternative forum.

### 2. Balance of Private and Public Interest Factors

Since an adequate alternative forum exists, the Court must balance the private and public interest factors to determine whether to dismiss the SAC on *forum non conveniens* grounds. However, before doing so, the Court must decide what level of deference Plaintiffs' choice of forum should be accorded. <u>See</u> <u>Carijano</u>, 643 F.3d at 1227.

### a. Level of Deference to Plaintiffs' Chosen Forum

Where a plaintiff is a United States citizen or resident, the plaintiff's choice of his home forum is entitled to substantial deference and the defendant must satisfy a heavy burden of proof. <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 256 (1981); <u>Lueck v. Sundstrand Corp.</u>, 236 F.3d 1137, 1143 (9th Cir. 2001); <u>see</u> <u>also</u> <u>Carijano</u>, 643 F.3d at 1227 ("When a domestic plaintiff initiates litigation in its home forum, it is presumptively convenient."). While courts afford substantial deference to a domestic plaintiff's choice of his home forum, that deference is "far from absolute." <u>Loya v. Starwood Hotel & Resorts Worldwide, Inc.</u>, 583 F.3d 656, 665 (9th Cir. 2009). "A district court has discretion to decide that a foreign forum is

9

more convenient." Id.

In this case, Willcox is a Canadian citizen and permanent resident of Hawaii. (SAC ¶ 6; Willcox Decl. ¶¶ 3-5 & 10-11; Mot. at 6.) Willcox has been living in Hawaii since 2002 and currently works as a professor at the University of Hawaii John Burns School of Medicine. (Willcox Decl. ¶¶ 3 & 8.)

As for Dominick, the parties contest his status. Dominick alleges in the SAC that he is a legal resident of Hong Kong and U.S. citizen. (SAC ¶ 7.) In his declaration, Dominick asserts that he is "technically" a legal resident of Hong Kong because he works in Hong Kong and is therefore obligated to have a Hong Kong ID card. (Dominick Decl. ¶ 2.) However, Dominick asserts that he has resided primarily in California since 2007 and only stays with friends or in a hotel while in Hong Kong. (Id. ¶¶ 3-4.) Lloyds questions Dominick's assertions and argues that Dominick has "substantial ties" to Hong Kong. (Reply at 8-9.) Lloyds presents evidence that, in February 2012, Dominick submitted a "Confirmation of Changes to Contact Details" form to Lloyds listing Hong Kong as his "country of residence" and providing a Hong Kong address for correspondence from Lloyds. (Reply Ex. 2.) Lloyds also presents evidence that Dominick is a managing partner at an investment management company located in Hong Kong. (Id. Ex. 3.)

Having reviewed the parties' submissions, the Court

concludes that Plaintiffs' choice of forum should be afforded substantial deference. As discussed, Willcox is a permanent resident of Hawaii and has been living in the state since 2002, which is five years before he took out the IMS loans. The Ninth Circuit has held that a resident plaintiff (Willcox's category) is entitled to the same deference as a citizen plaintiff. <u>Tuazon</u>, 433 F.3d at 1177 n. 6 (citing <u>Piper</u>, 454 U.S. at 256 n. 23). Regarding Dominick, he is a U.S. citizen, and the Ninth Circuit has "clarified that a [U.S.] citizen's decision to bring suit in a state in which the plaintiff is not a resident is still entitled to deference." <u>Neuralstem, Inc. v. ReNeuron, Ltd.</u>, 365 Fed. Appx. 770, 771 (citing <u>Boston Telecommunications Group, Inc. v. Wood</u>, 588 F.3d 1201, 1207 (9th Cir. 2009)). Further, even assuming arguendo that Dominick's apparent status as a legal resident of Hong Kong qualifies him as a "foreign plaintiff," the Ninth Circuit has explicitly rejected the argument that "when both domestic and foreign plaintiffs are present, the strong presumption in favor of the domestic plaintiff's choice of forum is [] lessened." <u>Carijano</u>, 643 F.3d at 1228.

Because the Court finds that Plaintiffs' decision to initiate this action in Hawaii is entitled to substantial deference, Lloyds bears a heavy burden of showing that the balance of private and public interest factors weighs strongly in its favor. <u>Piper</u>, 454 U.S. at 256; <u>Lueck</u>, 236 F.3d at 1143; <u>see</u>

also <u>Gates Learjet Corp. v. Jensen</u>, 743 F.2d 1325, 1334-35 (9th Cir. 1984) (". . . [U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."). The Court now turns to those factors.

**b. Private Interest Factors**

The Court weighs the following private interest factors:

> (1) relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses, and cost of obtaining attendance of willing witnesses; (3) possibility of viewing subject premises; [and] (4) all other factors that render trial of the case expeditious and inexpensive.

<u>Creative Technology, Ltd. v. Aztech System Pte., Ltd.</u>, 61 F.3d 696, 703 (9th Cir. 1995).

**i. Sources of Proof**

In terms of the parties, as discussed above, Willcox has lived in Hawaii at all times relevant to this action. Dominick is evidently a legal resident of Hong Kong, although he asserts in his declaration that he resides primarily in California. As for Lloyds, Plaintiffs allege that it "is a wholly-owned subsidiary of Lloyds Banking Group plc, organized and existing under the laws of the United Kingdom with branches in, among other places, the United States, Tokyo, Japan, and Hong Kong." (SAC ¶ 8.)

In terms of the witnesses and documents, Lloyds asserts that "virtually all" of the witnesses and relevant documents are located in Hong Kong. (Mot. at 14.) Lloyds notes that the facility and mortgage agreements indicate that the IMS loans originated and were serviced out of Lloyds' Hong Kong branch. See June 10 Order at 24 n. 10. Lloyds also directs the Court's attention to Willcox's Rule 26(a)(1) Initial Disclosures[5] (dated November 29, 2013), in which Willcox identifies individuals who are "likely to have discoverable information that [he] may use to support his claims." (Mot. Ex. I at 2-6.) The majority of these individuals are employees and representatives of Lloyds, including thirteen Hong Kong branch employees, and therefore they presumably reside outside of Hawaii. Conversely, only a minority of the individuals identified in Willcox's Initial Disclosures are located in Hawaii: Willcox himself and attorneys at Cades Schutte LLP, the Hawaii law firm that allegedly helped draft the IMS loan documents. (Id. at 3.) Willcox's Initial Disclosures further provide that Lloyds "is in possession and control of all, or the vast majority of information relevant" to his claims. (Id. at 8.)

Additionally, Lloyds notes that certain allegations in

---

[5]As Lloyds points out, Willcox's Initial Disclosures were served before Dominick was added as a named plaintiff "and thus may not account for any additional individuals Dominick might assert are likely to have discoverable information." (Mot. at 15-16.)

the SAC relate to its parent company. (<u>See</u>, <u>e.g.</u>, SAC ¶ 5.) In particular, Plaintiffs allege that from 1985 to 2008 Lloyds used one method for calculating the Cost of Funds, but changed that method in 2009 to account for a LTP charge imposed by its parent. (<u>Id.</u>) Witnesses and documents related to the LTP charge will likely be located in London, where Lloyds' parent is located.

In response to Lloyds' arguments regarding access to sources of proof, Plaintiffs claim that Lloyds shut down its Hong Kong branch operations on December 1, 2014, and moved those operations to the U.K. (Opp. at 20.) Plaintiffs submit correspondence from Lloyds (dated June 9, 2014), informing them that Lloyds is "proposing to close [the] Hong Kong branch" and "relocate [] mortgage operations to the" U.K., and that they "expect to complete this change in 2014." (<u>Id.</u> Exs. 19 & 22.) Plaintiffs claim that, as a result of this relocation, high-level Lloyds employees and documentary evidence will move to the U.K. (Opp. at 20.)

Through the declaration of Simon Cooper, Chief Executive of the Hong Kong branch, Lloyds clarifies that although the June 9 correspondence expressed an expectation that the Hong Kong branch would close by the end of 2014, a fixed date for the closure has not been set. (Cooper Decl. ¶ 8.) Lloyds states that the Hong Kong branch will remain open until at least May 2015. (<u>Id.</u>)

Further, Plaintiffs claim that key witnesses are located in Hawaii. Plaintiffs direct the Court's attention to Lloyds' Rule 26(a)(1) Initial Disclosures (dated November 29, 2013), in which Lloyds identifies a number of individuals who reside in Hawaii and who are "likely to have discoverable information." (Opp. Ex. 8 at 2-11.)

Plaintiffs also assert that the majority of relevant documents are not located in Hong Kong, but rather are in the possession of Lloyds' U.S. based counsel, Squire Patton Boggs ("SPG"). (Opp. at 21.) According to Plaintiffs, SPG has collected, reviewed and electronically processed much of this material as part of its litigation efforts in <u>Dugan</u>, a similar class action suit that was filed in the U.S. District Court for the Northern District of California.[6/] (<u>Id.</u>; <u>see</u> <u>also</u> footnote 1 <u>supra</u>.) Plaintiffs assert that SPG has informed their counsel on several occasions "that the bulk of what is required to be produced in this case has already been the subject of discovery in the [<u>Dugan</u>] litigation." (Melchinger Decl. ¶ 9.) Plaintiffs also produce a letter (dated October 2, 2014) that Lloyds sent to the plaintiff in <u>Washington Land Development</u>, a similar class action suit that was filed in the U.S. District Court for the

---

[6/]Plaintiffs submit evidence that Lloyds spent approximately $5 million on electronic discovery in <u>Dugan</u> and used a team of 19 attorneys and paralegals to review the collected material. (Opp. Ex. 2 at ¶¶ 6-10.)

Western District of Washington. (Opp. Ex. 9; see also footnote 1 supra.) In this letter, Lloyds offers to meet the majority of its discovery obligations by re-producing the Dugan material. (Id.)

In sum, one of the parties resides in Hawaii (Willcox), one resides in Hong Kong or California (Dominick), and one is located in Hong Kong or the U.K. (Lloyds). With respect to the witnesses and documents, Willcox's and Lloyd's Rule 26(a)(1) Initial Disclosures appear to indicate that the majority of individuals who are "likely to have discoverable information" are located outside of Hawaii, primarily in Hong Kong or the U.K. However, neither party addresses whether the individuals identified in these disclosures will be called to testify or will produce documents, let alone whether such testimony and documents are material and important. See Tuazon, 433 F.3d at 1181 (as to the location and availability of evidence and witnesses, "[t]he crucial focus is not on 'the number of witnesses or quantity of evidence in each locale,' but rather the 'materiality and importance of the anticipated evidence and witnesses' testimony'") (quoting Lueck, 236 F.3d at 1146). Further, Lloyds notes that the IMS loans originated and were serviced in Hong Kong, and that Willcox states in his Rule 26(a)(1) Initial Disclosures that Lloyds is in possession of the vast majority of relevant information. However, Plaintiffs submit evidence indicating that much of this information has already been

collected and electronically processed as part of Lloyds'
litigation efforts in <u>Dugan</u> and, therefore, is in possession of
Lloyds' U.S. based counsel.

For these reasons, and given the parties' competing
submissions, the Court finds that this factor slightly favors
Lloyds.

### ii. Availability of Compulsory Process for Attendance of Unwilling Witnesses and Cost of Obtaining Attendance of Willing Witnesses

Lloyds asserts that this Court's subpoena power
does not extend to Hong Kong residents. (Mot. at 17.) Plaintiffs
do not dispute this assertion. However, Lloyds states that
unwilling witnesses can be compelled to testify in Hawaii
proceedings through the provisions of the Hague Convention,
although Lloyds contends that this process is costly. (<u>Id.</u>)

As to the cost of obtaining the attendance of willing
witnesses, Willcox lives in Hawaii and Dominick appears to reside
in California at least part of the year. (<u>See</u> Dominick Decl. ¶ 4
(stating that his children attend California schools and that he
has held a valid California driver's license for the last seven
years).) Further, Plaintiffs assert that several key witnesses
reside in Hawaii, including local brokers who allegedly helped
administer the IMS loans as well as several attorneys at Cades
Schutte LLP. Nevertheless, it appears that most witnesses are
likely to be employees or representatives of Lloyds and therefore

will have to travel from overseas, either from Hong Kong or the
U.K., to testify at a trial in Hawaii.

For the foregoing reasons, the Court concludes that
this factor weighs in favor of Lloyds.

### iii. Viewing Subject Premises

Although Plaintiffs' IMS loans are secured by five
properties located in Hawaii and one property located in
California, the Court agrees with Lloyds that "there is no need
to view or visit these properties in order to adjudicate
Plaintiffs' claims." (Mot. at 18.) Plaintiffs' claims are
contractual in nature and turn on the question of whether Lloyds
breached the facility agreements by inappropriately increasing
the Cost of Funds component of the variable interest rate of the
IMS loans, as alleged in the SAC. Thus, this factor is neutral.

### iv. All Other Private Factors Rendering Trial
### Expeditious and Inexpensive

Finally, the Court considers all other private factors
rendering trial of this case expeditious and inexpensive.

Here, Lloyds argues in a conclusory manner that "the
courts in Hong Kong are adequately equipped to handle the
contractual claims asserted by Plaintiffs in an efficient and
expeditious manner." (Mot. at 21.) However, Lloyds does not
specify *how* Hong Kong courts are able to handle Plaintiffs'
claims in an efficient and expeditious manner. Cf. Lajouj, 2008
WL 2858262, at *7 (noting that "[t]he KRS Defendants argue that

the court system in the [Republic of the Marshall Islands
("RMI")] is largely based upon American substantive and
procedural law" and, "[t]herefore, according to the KRS
Defendants, discovery efforts and trial can be timely and
efficient in the courts of the RMI.").

As to Plaintiffs, they note that there is an additional
private interest factor that this Court must consider: "the
ability to enforce any judgment obtained." (Opp. at 24 n. 7.)
However, Plaintiffs "submit [that] enforceability is not an
issue." (<u>Id.</u>) Lloyds does not argue that enforcing a judgment is
a concern in this case. Accordingly, the final private interest
factor is neutral. <u>See</u> <u>Boston Telecomms. Group, Inc. v. Wood</u>, 588
F.3d 1201, 1210 (9th Cir. 2009) ("Neither party has argued that
there would be any problem enforcing a judgment in either forum,
and thus the district court properly concluded that [this factor]
was neutral.").

### c. Public Interest Factors

The Court also weighs the following public interest
factors:

> (1) administrative difficulties flowing from
> court congestion; (2) imposition of jury duty
> on the people of a community that has no
> relation to the litigation; (3) local
> interest in having localized controversies
> decided at home; (4) the interest in having a
> diversity case tried in a forum familiar with
> the law that governs the action; and (5) the
> avoidance of unnecessary problems in
> conflicts of law.

19

<u>Creative Technology</u>, 61 F.3d at 703-704.

### i. Court Congestion

Lloyds has failed to indicate whether or not the courts of Hong Kong have congested dockets. This Court's docket is not congested. Accordingly, this factor weighs in favor of Plaintiffs.

### ii. Jury Interest

Hong Kong jurors are unlikely to have an interest in this case since Lloyds is closing its Hong Kong branch. In contrast, Hawaii jurors have a strong interest in this case because the subject properties (excluding Dominick's California property) are located in Hawaii, Willcox is a permanent resident of Hawaii, a Hawaii law firm allegedly helped draft the IMS loan documents, and Lloyds allegedly "transacts business in Hawaii" and sells IMS loans in Hawaii. (SAC ¶ 8.) Hawaii jurors definitely have a strong interest in adjudicating claims involving how Willcox and other Hawaii residents are treated by foreign lenders. Accordingly, this factor weighs strongly in favor of Plaintiffs.[7]

---

[7]Lloyds argues that this factor weighs in its favor because the substantial majority of witnesses allegedly reside in Hong Kong and Hong Kong jurors are "'better able to assess the credibility' of these witnesses 'given [their] familiarity with the culture' in Hong Kong." (Mot. at 21) (quoting <u>Lajouj</u>, 2008 WL 2858262, at *8.) However, the Ninth Circuit has rejected a similar argument and recognized that "[j]uries routinely address subjects that are totally foreign to them, ranging from the

(continued...)

### iii. Local Interest

For the same reasons as the previous factor, the Court finds that this factor favors Plaintiffs. Unlike Hong Kong, Hawaii has a strong interest in this case.

### iv. Familiarity with Governing Law

The Court has already determined that the claims at issue are governed by Hong Kong law. <u>See</u> June 10 Order at 45. Because Hong Kong courts are better suited to apply and interpret Hong Kong law, this factor weighs in favor of dismissal.

### v. Avoidance of Conflict of Law Problems

As noted directly above, the Court has already concluded that Plaintiffs' claims are governed by Hong Kong law. Thus, no conflict of law problems will likely arise in this case. Accordingly, this factor is neutral.

### d. Summary of Private and Public Interest Factors

The private interest factor relating to sources of proof weighs slightly in favor of Lloyds. The private interest factor relating to the availability of compulsory process for the attendance of unwilling witnesses and cost of obtaining attendance of willing witnesses weighs in favor of Lloyds. The remaining private interest factors are neutral.

---

[7/](...continued)
foreign language of patent disputes to cases involving foreign companies, foreign cultures and foreign languages." <u>Tuazon</u>, 433 F.3d at 1181-82.

The public interest factors relating to court congestion, jury interest, and local interest weigh in favor of Plaintiffs. The public interest factor relating to familiarity with governing law weighs in favor of Lloyds.[8/] The remaining public interest factor is neutral.

On balance, Lloyds has not met its heavy burden of demonstrating that the substantial deference accorded to Plaintiffs' choice of forum should be disturbed. <u>Piper</u>, 454 U.S. at 256; <u>Lueck</u>, 236 F.3d at 1143; <u>see also</u> <u>Jensen</u>, 743 F.2d at 1334-35 (". . . [U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."). The Court notes that while Plaintiffs' claims are governed by Hong Kong law, the parties can supply the relevant Hong Kong authorities as they have done in a prior motion and in the instant motion.[9/] (<u>See</u> Doc. Nos. 37-38, 62 & 67.)

For these reasons, the Court DENIES Defendant's Motion

---

[8/]The Court notes that while this factor weighs in favor of dismissal, it is not dispositive in a *forum non conveniens* analysis. <u>Piper</u>, 454 U.S. at 260.

[9/]The Court also notes that Lloyds has not sought dismissal of the <u>Dugan</u> or <u>Washington Land Development</u> actions on the basis of *forum non conveniens*. The Court further notes that Lloyds earlier filed with the United States Judicial Panel on Multidistrict Litigation a Motion for Transfer of Related Actions to the Northern District of California for Coordinated or Consolidated Pretrial Proceedings pursuant to 28 U.S.C. § 1407. (Doc. No. 5.) On February 14, 2014, the Panel issued an order denying Lloyds' Motion for Transfer of Related Actions. (Doc. No. 29.)

to Dismiss for *forum non conveniens*.

## II.      Motion to Dismiss for Failure to State a Claim

### A. Legal Standard

### 1. Rule 12(b)(6)

While Hong Kong law governs the substance of Plaintiffs' contractual and declaratory relief claims; Federal Rule of Civil Procedure ("Rule") 12(b)(6) governs this portion of Lloyds' Motion procedurally.

Rule 12(b)(6) authorizes the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted." Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Court may dismiss a complaint either because it lacks a cognizable legal theory or because it lacks sufficient factual allegations to support a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).

In resolving a Rule 12(b)(6) motion, the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations as true. Sateriale v. R.J. Reynolds Tobacco Co., 697 F.3d 777, 783 (9th Cir. 2012). The complaint must contain sufficient factual matter accepted as true to "state a claim to relief that is

plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678
(2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570
(2007)). "The plausibility standard . . . asks for more than a
sheer possibility that a defendant has acted unlawfully. Where a
complaint pleads facts that are 'merely consistent with' a
defendant's liability, it 'stops short of the line between
possibility and plausibility of entitlement to relief.'" <u>Iqbal</u>,
556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 556-57). However,
in considering a motion to dismiss, "the court is not deciding
whether a claimant will ultimately prevail but rather whether the
claimant is entitled to offer evidence to support the claims
asserted." <u>Tedder v. Deutsche Bank Nat. Trust Co.</u>, 863 F. Supp.
2d 1020, 1030 (D. Haw. 2012) (citing <u>Twombly</u>, 550 U.S. at 563 n.
8).

### 2. Consideration of Materials Outside the SAC

"Generally, the scope of review on a motion to dismiss
for failure to state a claim is limited to the contents of the
complaint." <u>Marder v. Lopez</u>, 450 F.3d 445, 448 (9th Cir. 2006).
However, "[a] court may consider evidence on which the complaint
'necessarily relies' if: (1) the complaint refers to the
document; (2) the document is central to the plaintiff's claim;
and (3) no party questions the authenticity of the copy attached
to the 12(b)(6) motion." <u>Id.</u> The court is allowed to treat such a
document as "part of the complaint, and thus may assume that its

24

contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." Id. The Ninth Circuit has extended the "incorporation by reference" doctrine to situations in which a plaintiff does not explicitly allege the contents of the document if "the plaintiff's claim depends on the contents of [the] document" and "the parties do not dispute the authenticity of the document." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005). Additionally, when deciding on a Rule 12(b)(6) motion, the Court may consider a document subject to judicial notice. U.S. v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).

In ruling on the Rule 12(b)(6) portion of Lloyds' Motion, the Court considers Exhibits A to F of Lloyds' Motion and Exhibits 11 to 20 of Plaintiffs' Opposition.[10/] Exhibits A to F and 11 to 20 are copies of the facility agreements and mortgage agreements signed by Plaintiffs. These documents are referred to extensively in the SAC, essential to Plaintiffs' contractual and declaratory relief claims, and neither party questions the documents' authenticity. (See, e.g., SAC ¶¶ 2, 21 & 29.)

The Court also considers Exhibits 1, 2, and 6 of Plaintiffs' Opposition, Exhibits J to O of Lloyds' Motion, and the exhibits attached to Plaintiffs' Notice of Intent to Rely on

---

[10/]The Court notes that, at the Dec. 15 hearing, the parties agreed that the Court could consider their exhibits without converting the instant motion to dismiss into a motion for summary judgment.

Foreign Law. These exhibits are copies of decisions from two similar class action suits filed against Lloyds in federal district courts in Washington and California, <u>see</u> footnote 1 <u>supra</u>, and copies of foreign court decisions. <u>See</u> <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 689 (9th Cir. 2001) (explaining that a court can take judicial notice of another court's opinions); <u>MCA, Inc. v. U.S.</u>, 685 F.2d 1099, 1103 n. 12 (9th Cir. 1982) (holding that a federal court may take judicial notice of foreign law under Rule 44.1 if the parties give written notice of their intent to raise an issue of foreign law).

Finally, the Court considers the declaration of Professor Anselmo Reyes, a former judge on the High Court of Hong Kong, who opines on Hong Kong law. <u>See</u> <u>MCA</u>, 685 F.2d at 1103 n. 12.

### B. Application

### 1. Breach of Contract (Count I)

To prevail on a breach of contract claim under Hong Kong law, a plaintiff must establish (1) that there were express or implied contractual terms requiring the defendant to act in some manner and (2) that the defendant has acted contrary to those express or implied terms. <u>Hongkong Fir Shipping Co. Ltd v. Kawasaki Kisen Kaisha</u>, [1962] 2 QB (QB Div. 1962) (Mot. Ex. J.) Contractual language is interpreted by "ascertain[ing] . . . the meaning which the document would convey to a reasonable person

having all the background knowledge which would reasonably have

been available to the parties in the situation in which they were

at the time of the contract." Investors Comp. Scheme Ltd. v. West

Bromwich Bldg. Soc'y, [1998] 1 WLR 896 at 17 (Doc. No. 67 Ex.

A)[11]; see also Jumbo King Ltd v. Faithful Properties Ltd, (1999)

2 HKCFAR 279, 296 (Doc. No. 67 Ex. B) (finding that

interpretation of a document includes consideration of "the

practical objects which it was intended to achieve").

Plaintiffs' breach of contract claim (Count I) is based

on the Cost of Funds provision in the IMS loans' facility

agreements. That provision states:

> The Bank's Cost of Funds means the cost
> (calculated to include the costs of complying
> with liquidity and reserve asset
> requirements) in respect of any currency
> expressed as a percentage rate of funding for
> maintaining the advance or advances in that
> currency as conclusively nominated by the
> Bank from time to time.

(See, e.g., Mot. Ex. A at 3.) Plaintiffs allege that Lloyds

breached this provision by "arbitrarily increasing its Cost of

---

[11]The Court notes that Investors Comp. is an English common
law case, and that both parties have previously recognized that
the body of Hong Kong law includes English common law. (Doc. No.
37-3 at 2) (expert opinion of Paul Kwan submitted in opposition
to Lloyds' 12/17/13 motion to dismiss) ("Because of its historic
ties with England, the current legal framework of Hong Kong is
based on English common law and Hong Kong legislation."); (Doc.
No. 38-1 at 4) (expert opinion of Professor Anselmo Reyes
submitted in support of Lloyds' 12/17/13 motion to dismiss)
(noting that "the body of Hong Kong law" includes English common
law).)

Funds." (SAC ¶ 59.) Plaintiffs further allege that, from 1985 to 2008, Lloyds used one method for calculating its Cost of Funds, but that in 2009 Lloyds added several basis points to the Cost of Funds as a result of the imposition by its parent of a LTP charge. (Id. ¶ 5.) According to Plaintiffs, Lloyds' inclusion of the LTP charge breached the Cost of Funds provision because the charge did not reflect the cost of funding the IMS loans, but rather reflected "the cost of funding Lloyds' parent's overhead and operations as a whole." (Id.) Plaintiffs also allege that, at the same time as Lloyds increased the Cost of Funds, standard indexes for interest rates like LIBOR were falling. (Id. ¶ 4.)[12]

Lloyds makes two basic arguments for dismissing Plaintiffs' breach of contract claim.

First, Lloyds argues that the increase in the Cost of Funds component of the interest rate was not "arbitrary" because the increase was the direct result of a LTP charge imposed on Lloyds by its parent and liquidity costs are included within the definition of "Cost of Funds." (Mot. at 27-28.) However, Lloyds does not explain the circumstances under which the LTP charge was included as part of the Cost of Funds or how the LTP charge was

_____

[12]In their First Cause of Action, Plaintiffs also allege that "Lloyds breached an implied duty to act honestly and in good faith in exercising any discretion it held to change the [IMS loans'] interest rates." (SAC ¶ 60.) This allegation will be addressed below in connection with Plaintiffs' claim for "Breach of an Implied Term Limiting Lloyds' Discretion to Change the Interest Rate" (Count II).

computed.[13/] At this motion to dismiss stage, the Court need not decide (and lacks the information to decide) whether the LTP charge passed on to the IMS loan borrowers "the cost of funding Lloyds' parent's overhead and operations as a whole, not just the cost of funding their own IMS loans," as alleged by Plaintiffs. (SAC ¶ 5.)

Second, Lloyds mischaracterizes Plaintiffs' breach of contract claim by implying that its success depends on whether the Cost of Funds provision explicitly refers to LIBOR or other market indexes. (Mot. at 29-30.) Lloyds made a similar argument in Washington Land Development, which Judge Coughenour rejected:

> Defendant devotes most of its time to this
> strawman argument. But Plaintiff merely
> points to the LIBOR index as supporting
> evidence. This is not "forc[ing] LIBOR into
> the Cost of Funds definition," as Defendant
> suggests, but merely suggesting one reason to
> think that the increase did not reflect a
> cost properly attributable to Lloyds Bank.

(Opp. Ex. 6 at 4.)

In sum, Plaintiffs plausibly allege that incorporating the LTP charge breached the Cost of Funds provision by passing on to the IMS loan borrowers the cost of funding Lloyds' parent's overhead and operations as a whole; rather than an amount allowable under Hong Kong law. Accordingly, the Court DENIES

---

[13/]The Court notes that, at the Dec. 15 hearing, Lloyds stated that the change in method for calculating the Cost of Funds, and specifically the LTP charge, in 2009 was the result of new regulatory requirements imposed after the financial crisis.

Defendant's Motion to Dismiss Plaintiffs' breach of contract claim (Count I).

## 2. Breach of an Implied Term Limiting Lloyds' Discretion to Change the Interest Rate (Count II)

In Count II, Plaintiffs claim that the facility agreement contains "[a]n implied term requiring Lloyds to exercise any discretion it has to change the Cost of Funds component of the interest [rate] honestly and in good faith, and not for an improper purpose, capriciously or arbitrarily, having regard to the proper purpose and provision of the contract." (SAC ¶ 69.) Plaintiffs claim that Lloyds breached this alleged implied term "by arbitrarily passing on Lloyds' [p]arent's LTP charge for purposes of greed rather than for commercially reasonable reasons." (Opp. at 35) (citing SAC ¶¶ 64-71.)

Under Hong Kong law, which includes English common law,[14] courts do not read into every contract implied terms requiring parties to act in good faith. (Reyes Decl. ¶ 9) (citing Greenclose Ltd. v. National Westminster Bank, [2014] EWHC 1156 (Ch Div. 14 April 2014), at ¶ 150 (Mot. Ex. K) (". . . [T]here is no general doctrine of good faith in English contract law and such a term is unlikely to arise by way of necessary implication in a contract between two sophisticated commercial parties negotiating at arms' length").) However, in circumstances similar

---

[14] See footnote 11 supra.

to those in the instant case, courts have read into contracts implied terms requiring parties to exercise their discretion to adjust rates in good faith.

For instance, in <u>Pacific Long Distance Tel. Corp. Ltd. v. New World Telecomm. Ltd.</u>, a contractual provision allowed a company to "revise the Agreement and/or introduce additional terms and conditions from time to time." [2012] HCA 1688/2006 ¶ 32 (Doc. No. 67 Ex. E). The company invoked this provision to substantially increase rates. <u>Id.</u> ¶¶ 32-33. The Hong Kong court held that, although the contractual provision contained no explicit limit on the company's discretion to set rates, the company nevertheless breached "an implied term that the rights set out in that clause should be exercised on a commercial footing, reflecting market rates for the provision of such services, but not for any collateral purpose." <u>Id.</u> ¶ 48.

Similarly, in <u>Nash v. Paragon Finance PLC</u>, which involved a variable interest rate provision, an English court found that there was an implied term in the contract "that the rate[] of interest would not be set dishonestly, for an improper purpose, capriciously or arbitrarily."[15/] [2001] EWCA Civ. 1466 ¶

---

[15/]The Court notes that Lloyds' own expert in Hong Kong law, Professor Anselmo Reyes, recognizes that the <u>Paragon Finance</u> court "identified an implied term of good faith prohibiting the lender from 'set[ting] interest rates unreasonably.'" (Reyes Decl. ¶ 11.)

36 (Ct. App. 2001) (Mot. Ex. M). A more recent English case
"recognized 'well established' authority that 'a power conferred
by a contract on one party to make decisions which affect them
both must be exercised honestly and in good faith for the purpose
for which it was conferred, and must not be exercised
arbitrarily, capriciously or unreasonably (in the sense of
irrationally).'" (Opp. Ex. 6 at 7) (citing Yam Seng Pte Ltd. v.
International Trade Corp. Ltd., [2013] EWHC 11 (QB) ¶ 145).

In accordance with Pacific Long, Paragon, and
Yam Seng, this Court concludes that Plaintiffs plausibly claim
that there is an implied term in the facility agreements
requiring Lloyds to exercise its discretion to adjust the Cost of
Funds component of the interest rate in good faith. Having so
concluded, the Court next turns to the question of whether Lloyds
plausibly claims that Lloyds breached this alleged implied term.

Lloyds argues that the increase in the Cost of Funds
component of the interest rate "does not qualify, as a matter of
Hong Kong law, as a breach of any implied good faith term." (Mot.
at 32.) Lloyds relies on the above mentioned Paragon case in
support of this argument.

In Paragon, the borrowers entered into mortgage loan
agreements with Paragon Finance. Paragon, [2001] EWCA Civ. 1466
¶¶ 2-6. The loan agreements provided: "Interest shall be charged
at such rate as [Paragon Finance] shall from time to time apply

. . . and may accordingly be increased or decreased by [Paragon Finance] at any time and with effect from such date or dates as [Paragon Finance] shall determine[.]" Id. ¶ 8. As noted, the court determined that there was an implied term in the loan agreements "that the rates of interest would not be set dishonestly, for an improper purpose, capriciously or arbitrarily." Id. ¶ 36. The court then determined that Paragon Finance did not violate this implied term by charging interest rates substantially above prevailing market rates because Paragon Finance was accounting for its increased costs:

> In my judgment, the mere fact that the rates
> charged were made "without reference to the
> prevailing rates" is not evidence from which
> it can be inferred that, in fixing them,
> [Paragon Finance] acted in breach of the
> implied term. . . . One of the reasons for
> [the high interest rate] . . . was that
> [Paragon Finance] was in serious financial
> difficulties because many of its borrowers
> had defaulted, the money markets charged
> higher rates for lending to [Paragon Finance]
> because it was perceived to be a greater risk
> than other mortgage lenders, and these higher
> costs had been passed on to borrowers. . . .
> In my view, if it was the case that the rates
> were increased because [Paragon Finance] was
> in financial difficulties for reasons of that
> kind, that would not be a breach of the
> implied term. If a lender is in financial
> difficulty, for example, because it is
> obliged to pay higher rates on interest to
> the money market, then it is likely to have
> to pass those increased costs on to its
> borrowers. If in such circumstances the rate
> of interest charged to a borrower is
> increased, it is impossible to say that the
> discretion to set the rate of interest is
> being exercised for an improper purpose,

capriciously, [or] arbitrarily[.]

Id. ¶ 46.

Although the court concluded that Paragon Finance did not breach the implied contractual term requiring it to exercise its discretion to adjust the interest rate in good faith, the court reasoned that Paragon Finance was accounting for its increased costs of borrowing from money markets when setting the interest rate. In this case, as noted, Lloyds fails to provide any information regarding the circumstances under which the LTP charge was included as part of the Cost of Funds or how the LTP charge was computed. Thus, the Court lacks sufficient information to determine whether Lloyds passed on to the IMS loan borrowers an amount allowable under Hong Kong law.

In sum, Plaintiffs plausibly allege that Lloyds breached an implied term – requiring Lloyds to exercise its discretion to adjust the Cost of Funds in good faith – by passing on to the IMS loan borrowers an amount not allowed under Hong Kong law. Accordingly, the Court DENIES Defendant's Motion to Dismiss Plaintiffs' claim for breach of an implied term (Count II).

### 3. Declaratory Relief (Count III)

Lloyds argues that Plaintiffs' declaratory relief claim (Count III) is not cognizable as an independent cause of action under Hong Kong law. (Mot. at 35.) In support, Lloyds relies on

the declaration of Professor Reyes. (Reyes Decl. ¶ 2.) Reyes asserts that, under Hong Kong law, declaratory relief "is not an independent cause of action," but rather "is an equitable or statutory remedy." (Id. ¶ 13.) Reyes supplies two Hong Kong cases that appear to assert the same. See Eton Properties and others, [2012] HKCU 2289, at ¶ 19 (Mot. Ex. N) (finding that "a court should hesitate long and hard before granting 'declaratory' relief in its true form, which is an equitable (or statutory) remedy which serves to establish and/or to clarify the substantive rights of a party") (emphasis added); Charter View Development Ltd. v. Golden Rich Enterprises Ltd., [2002] HKCU 173, at 3 (Mot. Ex. O) ("There is no doubt that declaratory relief has for many years been embraced in common law jurisdictions as a valuable and flexible remedy appropriate for use in many different contexts.") (emphasis added).

In opposing Lloyds' argument, Plaintiffs rely on a decision from a federal court in California applying California law. (Opp. at 37.) As noted, this Court must apply Hong Kong law to Plaintiffs' claims in the SAC. Plaintiffs do not supply the Court with any Hong Kong law regarding the cognizability of a declaratory relief claim as an independent cause of action. The Court therefore relies on the Reyes declaration and the two Hong Kong cases cited by him, and concludes that under Hong Kong law declaratory relief is permitted as a remedy, but is not

cognizable as an independent cause of action. If this Court ultimately rules that Plaintiffs prevail on their contractual claims, then such a ruling could provide any appropriate declaratory relief or remedy.

**CONCLUSION**

For the foregoing reasons, the Court: (1) DENIES Defendant's motion to dismiss for *forum non conveniens*; and (2) GRANTS IN PART AND DENIES IN PART Defendant's motion to dismiss for failure to state a claim upon which relief can be granted.

Regarding the second holding, the Court DENIES Defendant's motion to dismiss as to Plaintiffs' claims for Breach of Contract (Count I) and Breach of an Implied Term Limiting Lloyds' Discretion to Change the Interest Rate (Count II). However, the Court GRANTS Defendant's motion to dismiss as to Plaintiffs' claim for Declaratory Relief (Count III).

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, December 23, 2014.



_____
Alan C. Kay
Senior United States District Judge

Willcox vs. Lloyds TSB Bank, PLC, Civ. No. 13-00508 ACK-RLP: ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

36