IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

———————————————————————————

BRADLEY WILLCOX, FRANK DOMINICK,       )
and MICHELE SHERIE DOMINICK,           )
                                       )
            Plaintiffs,                )
                                       )
v.                                     )  Civ. No. 13-00508 ACK-RLP
                                       )
LLOYDS TSB BANK, PLC and DOES          )
1-15,                                  )
                                       )
            Defendants.                )
———————————————————————————————

ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THEIR AND THE PUTATIVE CLASS'S CLAIM FOR BREACH OF CONTRACT ON COUNT I, DENYING PLAINTIFFS' REQUEST FOR DECLATORY RELIEF, GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND SUA SPONTE GRANTING PARTIAL SUMMARY JUDGMENT TO PLAINTIFFS ON COUNT II

        For the reasons set forth below, the Court DENIES

Plaintiffs' Motion for Partial Summary Judgment on Their and the

Putative Class's Claim for Breach of Contract, ECF No. 251,

GRANTS in part and DENIES in part Defendant Lloyds TSB Bank

PLC's Motion for Summary Judgment, ECF No. 249, and *sua sponte*

GRANTS partial summary judgment to Plaintiffs on Count II.  The

Court also DENIES Plaintiffs' request for declaratory relief.

## PROCEDURAL BACKGROUND

        On September 13, 2013, Plaintiff Bradley Willcox filed

a Complaint on behalf of himself and a similarly situated class

against Defendant Lloyds TSB Bank, PLC, now known as Lloyds Bank

PLC ("Lloyds" or "Defendant"), in the Circuit Court of the First

Circuit, State of Hawaii. Compl., ECF No. 1-2. On October 7, 2013, Lloyds removed the case to federal court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332.[1] Notice of Removal, ECF No. 1.

On December 3, 2013, Willcox filed a First Amended Complaint, adding Frank Dominick as a named plaintiff. The First Amended Complaint brought a claim under the Hawaii Unfair and Deceptive Trade Practices Act, H.R.S. §§ 480-2 and 481A-3(a)(12), and requested declaratory relief pursuant to H.R.S. §§ 632-1 et seq. and 28 U.S.C. §§ 2201 and 2202. See First Am. Compl. ¶¶ 61-77, ECF No. 25.

On December 17, 2013, Lloyds moved to dismiss the First Amended Complaint. Def. Lloyds' Mot. to Dismiss the Claims Asserted in the First Am. Compl., ECF No. 26. On June 10, 2014, the Court granted Lloyds' motion. Order Granting Def.'s Mot. to Dismiss, ECF No. 49. The Court concluded that the Hong Kong choice-of-law provision in the parties' contractual agreements precluded the assertion of Hawaii and U.S. statutory claims; accordingly, it dismissed the First

---

[1] Class action suits involving similar loan products and claims as those at issue in the instant case were filed against Lloyds in federal district courts in California and Washington: (1) Dugan v. Lloyds TSB Bank, Civ. No. 3:12-cv-02549-WHA (N.D. Cal.); (2) Osmena v. Lloyds TSB Bank, Civ. No. 3:12-cv-02937-WHA (N.D. Cal.) (since consolidated with Dugan); and (3) Washington Land Development, LLC v. Lloyds TSB Bank plc, 2:14-cv-00179-JCC (W.D. Wash.). Each of these cases has been dismissed following settlement.

Amended Complaint in its entirety.  _Id._ at 46.  However, the Court granted Willcox and Dominick leave to file a further amended complaint.  _Id._

On August 14, 2014, Willcox and Dominick filed a Second Amended Complaint ("SAC"), bringing claims under Hong Kong law for Breach of Contract (Count I), Breach of an Implied Term Limiting Lloyds' Discretion to Change the Interest Rate (Count II), and declaratory relief (Count III).  _See_ Second Am. Compl. ¶¶ 54-78, ECF No. 61.

On September 19, 2014, Lloyds moved to dismiss the SAC on grounds of _forum non conveniens_ and failure to state a claim. Def. Lloyds' Mot. to Dismiss the Claims Asserted in the Second Am. Compl., ECF No. 62.  On December 23, 2014, the Court issued an Order Granting in Part and Denying in Part Defendant's Motion to Dismiss.  ECF No. 73.  The Court denied Lloyds' motion to dismiss for _forum non conveniens_ and for failure to state a claim as to Counts I and II of the SAC.  However, it granted Lloyds' motion as to Willcox and Dominick's claim for declaratory relief (Count III), noting that such relief was a remedy (rather than an independent cause of action) and that the Court could "provide any appropriate declaratory relief or remedy" if it "ultimately rules that Plaintiffs prevail on their contractual claims."  _Id._ at 35-36.

On January 9, 2015, Lloyds moved to join Michele Sherie Dominick, wife of named Plaintiff Frank Dominick, as a party.  ECF No. 76.  Magistrate Judge Puglisi issued an Order Granting Defendant Lloyds' Motion to Join Michele Sherie Dominick as a Party on March 16, 2015.  ECF No. 94.  That order directed that an amended complaint naming Ms. Dominick as a party to this action be filed by March 27, 2015.  Id. at 10.

Plaintiffs filed the operative Third Amended Complaint ("TAC") on March 27, 2015.  ECF No. 100.  The TAC names Frank Dominick, Michele Sherie Dominick, and Bradley Willcox (collectively, "Plaintiffs") as class representatives and brings claims for Breach of Contract (Count I) and Breach of an Implied Term Limiting Lloyds' Discretion to Change the Interest Rate (Count II).  Id. ¶¶ 6-8, 55-72.

On July 15, 2015, Plaintiffs filed a Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23.  ECF No. 156.  After briefing and oral argument from the parties, Magistrate Judge Puglisi issued his Findings and Recommendation to Grant in Part and Deny in Part Plaintiffs' Motion for Class Certification ("F&R") on November 12, 2015.  ECF No. 317.  The F&R recommended: (1) certifying the instant case as a class action, (2) appointing Willcox (but not the Dominicks) as class representative, (3) appointing Alston Hunt Floyd & Ing and Steptoe & Johnson LLP as class counsel, (4) directing the

- 4 -

parties to meet and confer regarding notice to class members,
(5) denying any remaining relief requested in Plaintiffs' class
certification motion, and (6) defining the certified class as:

> All persons and entities who entered prior
> to August 2009 into an IMS [International
> Mortgage System] loan with Lloyds that
> contained a Hong Kong choice-of-law
> provision and an interest rate provision
> based upon Cost of Funds and who are, or
> were at any time during entering into such
> an IMS loan, residents or citizens of the
> State of Hawaii, or owners of property in
> Hawaii that was mortgaged to secure any such
> IMS loan.

Id. at 31-32.  Lloyds filed objections to the F&R on November
25, 2015, ECF No. 332, to which Plaintiffs filed a Response on
December 9, 2015, ECF No. 335.  The parties also submitted
supplemental Reply and Sur-Reply briefs on December 17, 2015 and
December 28, 2015, respectively.  ECF Nos. 337, 340.

On January 8, 2016, the Court issued an Order Adopting
in Part, Rejecting in Part, and Modifying in Part the Findings
and Recommendations to Grant in Part and Deny in Part
Plaintiffs' Motion for Class Certification.  ECF No. 366.  For
the reasons explained therein, the Court adopted the F&R over
Lloyds' objections, except as to the class definition, which the
Court modified to include only plaintiffs of U.S. and Canadian
citizenship.  On January 22, 2016, pursuant to Federal Rule of
Civil Procedure 23(f), Lloyds filed with the Ninth Circuit a
Petition for Permission to Appeal the class certification Order.

ECF No. 397.[2]  Plaintiffs filed an Opposition to the Petition for

Permission to Appeal on February 1, 2016.  9th Cir., No. 16-

80009, ECF No. 4.

Meanwhile, on October 16, 2015, Plaintiffs and Lloyds

had filed the instant cross-motions for summary judgment.

Lloyds moves for summary judgment as to both of Plaintiffs'

Counts I and II.  See Def. Lloyds' Mot. for Summ. J. ("Def.'s

MSJ") at 4, ECF No. 249.  Plaintiffs move for summary judgment

only as to their Count I and request "immediate declaratory

relief" as to that claim.  Pls.' Mot. for Partial Summ. J. on

Their and the Putative Class's Claim for Breach of Contract

("Pls.' MSJ") at 1, ECF No. 251.

On the same date, each party also filed a Concise

Statement of Facts in support of its motion.  See Def. Lloyds'

Separate and Concise Statement of Undisputed Facts in Supp. of

its Mot. for Summ. J. ("Def.'s CSF"), ECF No. 250; Concise

---

[2] Rule 23(f) states, "A court of appeals may permit an appeal
from an order granting or denying class-action certification
under this rule if a petition for permission to appeal is filed
with the circuit clerk within 14 days after the order is
entered.  An appeal does not stay proceedings in the district
court unless the district judge or the court of appeals so
orders."  On February 3, 2016, Lloyds filed with this Court a
Motion to Stay Proceedings Pending Resolution of Dispositive
Motions, Rule 23(f) Petition, and Any Resulting Appeal.  ECF No.
402.  Magistrate Judge Puglisi thereafter suspended the parties'
obligations to meet and confer regarding notice to potential
class members and to submit to the Court a proposed class notice
and distribution plan, until the Court issues a decision on the
pending Motion to Stay.  ECF No. 405.

Statement of Facts in Supp. of Pls.' MSJ ("Pls.' CSF"), ECF No. 253.  In addition, each party filed a Notice of Intent to Rely on Foreign Law pursuant to Federal Rule of Civil Procedure 44.1. ECF Nos. 246, 247.[3]

On December 29, 2015, Plaintiffs filed an Opposition to Lloyds' summary judgment motion and a Concise Statement of Facts in support thereof.  See Pls.' Opp'n to Defs.' MSJ ("Pls.' Opp."), ECF No. 347; Concise Statement of Facts in Supp. of Pls.' Opp. ("Pls.' Opp. CSF"), ECF No. 349.  On the same date, Lloyds also filed an Opposition to Plaintiffs' summary judgment motion and a Concise Statement of Facts in support thereof.  See Def. Lloyds' Mem. of Law in Opp'n to Pls.' Mot. for Partial Summ. J. ("Def.'s Opp."), ECF No. 348; Def. Lloyds' Separate and Concise Counterstatement of Material Facts in Opp'n to Pls.' Mot. for Partial Summ. J. ("Def.'s Opp. CSF"), ECF No. 350. Also on that date, each side filed a Notice of Intent to Rely on

---

[3] Lloyds' Notice attaches a declaration of Judge Anselmo Reyes, a Professor of Legal Practice at the University of Hong Kong and former Judge of the High Court of Hong Kong.  See Decl. of Prof. Anselmo Reyes in Supp. of Lloyds Bank's Mot. for Summ. J. ("Reyes Decl.") ¶¶ 1-2, ECF No. 246-1.  Plaintiffs' Notice attaches a declaration of John Brewer, a barrister in the courts of the Hong Kong Special Administrative Region.  See Decl. of John Brewer in Supp. of Pls.' Mot. for Partial Summ. J. ("Brewer Decl.") ¶ 2, ECF No. 247-1.
   The declarations of Reyes and Brewer in turn attach a series of Hong Kong and United Kingdom legal authorities upon which they rely.

Foreign Law pursuant to Federal Rule of Civil Procedure 44.1. ECF Nos. 343, 345.[4]

On January 5, 2016, each party filed a Reply in support of its summary judgment motion. See Reply in Supp. of Pls.' MSJ ("Pls.' Reply"), ECF No. 358; Def. Lloyds' Reply Mem. of Law in Supp. of Lloyds' Mot. for Summ. J.("Def.'s Reply"), ECF No. 360. Lloyds' Reply was accompanied by a further Notice of Intent to Rely on Foreign Law pursuant to Federal Rule of Civil Procedure 44.1, filed on the same date. ECF No. 356.[5]

The Court held a two-day hearing regarding the instant motions on January 19-20, 2016.

## FACTUAL BACKGROUND

The instant case involves the issuance by Lloyds of certain dual currency loans (also referred to as International Mortgage System ("IMS") loans). Dual currency loans are mortgage loans with a currency switching feature that allows borrowers to switch the currency of their loans between United States dollars and other currencies. See TAC ¶¶ 1-3, ECF No. 100.

---

[4] Plaintiffs' Notice attaches a further expert declaration from Brewer. Decl. of John Brewer in Supp. of Pls.' Opp. to Lloyds Bank's Mot for Summ. J. ("Brewer Opp. Decl."), ECF No. 343-1. Lloyds' Notice attaches copies of Hong Kong and United Kingdom legal authorities but no additional expert declaration.

[5] Lloyds' Notice refers to previously-filed copies of Hong Kong and United Kingdom legal authorities but provides no additional expert declaration.

Lloyds is organized under the laws of the United Kingdom but maintains branches throughout the world, including a Hong Kong branch from which it issued IMS loans to Plaintiffs. See id. ¶¶ 1-3, 9. Lloyds is a wholly-owned subsidiary of Lloyds Banking Group, PLC ("LBG"). Id. ¶ 9.

## I. The "Cost of Funds" Provision in Lloyds' IMS Loans

The IMS loans at issue in this case were made from approximately 2005-2009 and secured by mortgages on real property in Hawaii and California. Id. ¶¶ 15, 21-22, 28-30. The loans have an interest rate that is set at 1.5% above Lloyds' "Cost of Funds," with the interest rate fixed for successive three-month periods. Id. ¶¶ 2, 16. The "Cost of Funds" is defined (with immaterial differences) in the loan documents as:

> [T]he cost (calculated to include the costs of complying with liquidity and reserve asset requirements) in respect of any currency expressed as a percentage rate of funding for maintaining the Advance or Advances in that currency as conclusively nominated by the Bank from time to time.

Id. ¶ 2. Interest payments on the loans are due, and the interest rate recalculated, at the end of each three-month period. Id. ¶ 16. As further discussed below, Plaintiffs' claims for breach of contract (Count I) and breach of an implied contractual term (Count II) allege that Lloyds impermissibly

- 9 -

included in its Cost of Funds calculation a charge that
constituted neither an actual cost to Lloyds in funding the
loans nor a liquidity requirement.  Id. ¶¶ 55-72.

## II.   The Named Plaintiff's Loans

Plaintiff Bradley Willcox is a resident of Hawaii who,
in 2007, took out approximately $1,284,500.00 in four IMS loans
from Lloyds, secured by four real properties located in
Honolulu, Hawaii.  Id. ¶¶ 6, 21-22.  Willcox took out the loans
in U.S. Dollars but chose to redenominate them to Japanese Yen
shortly after the transaction closed.  Id. ¶ 23.

Shortly thereafter, the world was struck by the 2008
financial crisis and the U.S. Dollar to Japanese Yen exchange
rate fell (i.e., the Yen grew stronger relative to the U.S.
Dollar), and Willcox's quarterly interest payments "dramatically
increased" by 2012.  Id. ¶ 24.  Willcox alleges that this
increase was, in part, a result of Lloyds' "arbitrary increases"
in its Cost of Funds.  Id. ¶ 25.  He further alleges that he is
not in arrears on his IMS loans and that Lloyds' Cost of Funds
increases caused him to pay "substantially more" than he
otherwise would have over the course of his loans.  Id. ¶¶ 26-
27.

## III. Allegations Regarding Lloyds' Cost of Funds

Plaintiffs claim that, in or around 2009, Lloyds added
several new basis points to its Cost of Funds calculation in

order to reflect the imposition by its parent company, LBG, of a "liquidity transfer pricing" ("LTP") charge.  Id. ¶ 5.

According to Plaintiffs, the LTP charge added to the Cost of Funds an amount "based not on the actual cost of funds for the Loans, but for Lloyds' parent's significantly longer-term set of obligations."  Id.  Plaintiffs argue that this represented Lloyds' attempt to pass on to borrowers "the cost of funding Lloyds' parent's overhead and operations as a whole, not just the cost of funding their own IMS Loans."  Id. (emphasis in original omitted).  Plaintiffs further observe that, during the period when Lloyds was increasing its Cost of Funds, standard interest rate indices such as the London Inter-Bank Offered Rate ("LIBOR") decreased.  Id.  ¶ 4.

As noted above, Plaintiffs filed this putative class action against Lloyds on September 13, 2013.  They allege that Lloyds' inclusion of the LTP charge in its Cost of Funds constitutes a breach of the express terms of Plaintiffs' loan agreements and a breach of an implied term limiting Lloyds' discretion to change Plaintiffs' interest rates.  See id. ¶¶ 55-72.

**STANDARD**

A party is entitled to summary judgment on any claim or defense if it can be shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law.'"  Maxwell v. Cty. of San Diego, 697 F.3d 941, 947 (9th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)).  A party asserting that a fact cannot be or that it is genuinely disputed must support the assertion by either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

The movant has the burden of persuading the court as to the absence of a genuine issue of material fact.  Avalos v. Baca, 596 F.3d 583, 587 (9th Cir. 2010).  If the movant satisfies its burden, the nonmovant must present evidence of a "genuine issue for trial," Fed. R. Civ. P. 56(e), that is "significantly probative or more than merely colorable,"[6] LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1137 (9th Cir. 2009) (citation omitted).  When evaluating a motion for summary judgment, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the

---

[6] The Ninth Circuit has explained that "[l]egal memoranda and oral argument, in the summary-judgment context, are not evidence, and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment."  Flaherty v. Warehousemen, Garage and Service Station Emp. Local Union No. 334, 574 F.2d 484, 486 n.2 (9th Cir. 1978); see also Barcamerica Intern. USA Trust v. Tyfield Importers, 289 F.3d 589, 593 n.4 (9th Cir. 2002).

summary judgment motion."  <u>Scott v. Harris</u>, 550 U.S. 372, 378

(2007).  If the nonmovant cannot produce sufficient evidence to

demonstrate that a triable issue of fact exists, the movant is

entitled to summary judgment as a matter of law.  <u>Anderson v.</u>

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).

## DISCUSSION

### I.   BREACH OF CONTRACT (COUNT I)

Plaintiffs allege that Lloyds breached the IMS loan

agreements by arbitrarily adding to its Cost of Funds an LTP

charge issued to Lloyds by its parent company, LBG.  Pls.' MSJ

at 1-2; TAC ¶¶ 1, 55-64.  For its part, Lloyds emphasizes that

"between 2009 and 2015, the element of the variable 'Cost of

Funds' component reflecting Lloyds Bank's liquidity costs

changed six times, increasing three times and decreasing three

times."  Def.'s MSJ at 2.  Further, it contends these

adjustments were implemented only after various committees

within Lloyds "carefully reviewed and formally approved" the

proposed changes.  <u>Id.</u>  Lloyds explains that "this careful,

considered process of reviewing and approving any adjustments to

the variable 'Cost of Funds' component does not constitute

'arbitrary' or 'capricious' behavior."  <u>Id.</u> at 2-3.

The loans' facility agreements contain a Hong Kong

choice of law provision, and this Court has previously concluded

that Hong Kong law governs Plaintiffs' contractual claims.

Order Granting Def.'s Mot. to Dismiss at 34, ECF No. 49.  To
prevail on a breach of contract claim under Hong Kong law, a
plaintiff must establish (1) that there were express or implied
contractual terms requiring the defendant to act in some manner,
and (2) that the defendant has acted contrary to those express
or implied terms.  Hongkong Fir Shipping Co. Ltd. v. Kawasaki
Kisen Kaisha Ltd., [1962] 2 QB 26 (CA).

    Under Hong Kong law, contractual language is
interpreted by "ascertain[ing] . . . the meaning which the
document would convey to a reasonable person having all the
background knowledge which would reasonably have been available
to the parties in the situation in which they were at the time
of the contract."[7]  Investors Comp. Scheme Ltd. v. W. Bromwich
Bldg. Soc'y, [1998] 1 WLR 896, 912[8]; see also Jumbo King Ltd. v.

_____

[7] The parties agree that no issue exists with regard to what
instructions or oral representations Lloyds, its agents, or its
representatives may have given to individual class members
regarding the loan documents.  See Pls.' Mot. for Class
Certification at 17-18, ECF No. 156; Order Adopting in Part,
Rejecting in Part, and Modifying in Part the Findings and
Recommendations to Grant in Part and Deny in Part Pls.' Mot. for
Class Certification at 16, ECF No. 366.

[8] The Court notes that Investors Comp. is an English common law
case, and that both parties have previously recognized that the
body of Hong Kong law includes English common law.  Decl. of
Paul Kwan submitted in opposition to Lloyds' December 17, 2013
motion to dismiss, ECF. No. 37-3 at 2 ("Because of its historic
ties with England, the current legal framework of Hong Kong
is based on English common law and Hong Kong legislation."); Decl.
of Anselmo Reyes submitted in support of Lloyds' December 17,

Faithful Props. Ltd., (1999) 2 HKCFAR 279, 296 (finding that interpretation of a document "is an attempt to discover what a reasonable person would have understood the parties to mean," which "involves having regard, not merely to the individual words they have used, but to the agreement as a whole, the factual and legal background against which it was concluded and the practical objects which it was intended to achieve").

### a. Whether the Cost of Funds Provision is Ambiguous

Because the parties dispute the meaning of the Cost of Funds provision contained in the facility agreements, the Court must first determine whether that provision is ambiguous. Whether a contractual term is ambiguous is a question of law for the Court to decide. Miller v. U.S., 363 F.3d 999, 1003-04 (9th Cir. 2004). In a contract case, summary judgment is only appropriate where the contract provision at issue is unambiguous. Castaneda v. Dura-Vent Corp., 648 F.2d 612, 619 (9th Cir. 1981). Conversely, where the contract term is ambiguous, the parties' intent becomes an issue of material fact and summary judgment is inappropriate. See id. at 619-20.

"Generally, language will be deemed ambiguous when it is reasonably susceptible to more than one interpretation." ASARCO, LLC v. Union Pacific R. Co., 765 F.3d 999, 1009 (9th

2013 motion to dismiss, ECF. No. 38-1 at 4 (noting that "the body of Hong Kong law" includes English common law).

Cir. 2014) (quoting 11 Richard A. Lord, <u>Williston on Contracts</u> § 32:2 (4th ed. 2014)). However, "[t]he fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous." <u>Klamath Water Users Protective Association v. Patterson</u>, 204 F.3d 1206, 1210 (9th Cir. 1999). A dispute regarding a material fact necessary to interpret the contract, on the other hand, may result in ambiguity. <u>Bower v. Bunker Hill Co.</u>, 725 F.2d 1221, 1223 (9th Cir. 1984).

Again, the bank's Cost of Funds is defined in the facility agreements as:

> [T]he cost (calculated to include the costs of complying with liquidity and reserve asset requirements) in respect of any currency expressed as a percentage rate of funding for maintaining the Advance or Advances in that currency as conclusively nominated by the Bank from time to time.

Plaintiffs first argue that the language used in the parenthetical, "calculated to include the costs of complying with liquidity . . . *requirements*," (emphasis added), permits Lloyds to include in the Cost of Funds calculation only those charges that constitute "mandatory costs" imposed by regulatory or supervisory bodies to which the bank is subject. Pls.' MSJ at 18. Plaintiffs contend that, had the agreements granted Lloyds the absolute right to define what figures went into the cost calculation, "it would have been entirely unnecessary to then explicitly define 'cost' to include 'liquidity and reserve

asset requirements.'"  Pls.' Opp. at 30; see also Pls.' Reply at
14 n.12 ("The only reasonable interpretation . . . is that the
express inclusion of two specific costs, 'liquidity and reserve
asset requirements,' would preclude other non-required costs
related to liquidity and reserve assets.")  Because LBG's LTP
charge reflected a liquidity "risk" that did not address a
mandatory requirement of a regulatory body, Plaintiff's argue,
Lloyds voluntarily – and impermissibly – passed through the
charge to borrowers.  Pls.' MSJ at 3-4, 19-20.

 Lloyds counters that the plain language of the
provision simply defines the Cost of Funds to *include* the costs
of complying with liquidity requirements.  Def.'s Opp. at 17.
It argues that the language does not, as Plaintiffs contend,
single out liquidity requirements as the sole liquidity charge
that Lloyds may figure into its cost calculation.  Id. at 18.
Thus, Lloyds asserts, allocation of the LTP charge to borrowers,
whether or not that charge was comprised solely of liquidity
requirements, was appropriate.  Id.

 The Court is not convinced that the language of the
Cost of Funds provision limits the cost calculation to liquidity
requirements, as Plaintiffs contend.  Courts will employ certain
canons of construction, such as *ejusdem generis* and *noscitur a
sociis*, to limit the meaning of a general term when a list of
specific terms is delineated within the text of a provision.

However, those canons do not apply here, where, as Lloyds rightfully points out, "cost" is simply defined to *include* liquidity requirements.  Indeed, while Plaintiffs contest the propriety of certain other costs that were factored into the Cost of Funds equation prior to 2009, namely, treasury administration costs and the bid/offer spread, they do concede that for over twenty years Lloyds had calculated its cost to include more than just "liquidity and reserve asset requirements."  See Pls.' MSJ at 4 n.4.  In fact, Plaintiffs and Lloyds are in agreement that the Cost of Funds component always included four elements:  (1) a liquidity charge; (2) a bid/offer spread; (3) treasury administration costs; and (4) 3-month LIBOR in the currency in which the loan is denominated.  Pls.' MSJ at 4 n.4; Def.'s Opp at 10-11.  Thus, the limited construction Plaintiffs give to the Cost of Funds provision is not borne out by Lloyds' historical practices pursuant to the facility agreements.

Nor does Plaintiffs' argument that explicit inclusion of two specific factors precludes other costs related to those factors persuade the Court.  Again, use of the word "include" indicates that "cost" is meant to encompass a more expansive list of factors, including standard, "non-required" liquidity costs that Lloyds actually incurred.  This is also confirmed by Lloyds' historical practice, prior to implementation of the LTP

charge, in which it routinely passed on "non-required" liquidity costs to borrowers.  See Dep. of Simon Cooper at 27:2-28:24, ECF No. 350-13; see also Dep. of Robin Milne at 34:20-35:9, ECF No. 350-12.  In fact, Lloyds' attorney argued at the hearing that if Lloyds had passed on only liquidity requirements to borrowers, it would have been funding the IMS loans at a loss – this is something Lloyds would not have agreed to do, and such conduct would have constituted an imprudent banking practice. Transcript of Hearing at 32-33, Jan. 20, 2016; see also Nash, et al. v. Paragon Fin. PLC, [2001] EWCA Civ. 1466, at ¶ 47 (15 Oct. 2001) (recognizing defendant bank's need to take into account "commercial considerations" in conducting business).

Plaintiffs and Lloyds next dispute the meaning of the phrase "as conclusively nominated by the Bank from time to time."  Plaintiffs argue that the phrase refers to Lloyds' right to change the IMS loans' currency – not the Cost of Funds calculation for the loans.  Pls.' MSJ at 22-23.  Plaintiffs support this notion by drawing attention to the fact that no other provision in the agreements outlines Lloyds' "critical right" to switch the currency of the loans; this, Plaintiffs maintain, necessitates that the Cost of Funds definition provide this entitlement.  Pls.' Opp. at 32.

Plaintiffs also outline several textual arguments which they assert support their reading of the provision.

- 19 -

Plaintiffs argue that since "nominate" means "to name," the use
of this term in the Cost of Funds provision must be in reference
to Lloyds' right to choose the currency of the loans, because
numerical interest rates are calculated.  Pls.' Opp. at 29.
Plaintiffs also contend that the phrase "from time to time" is
used in connection with "currency" elsewhere in the agreements;
further, since the facility agreements already provide for
updated interest rates every three months, the use of the phrase
"from time to time," if made in reference to the calculation of
"cost," would be "mere surplusage."  Id. at 31.

Lloyds responds that the phrase at issue appears in
the interest rate provision of the agreements under the heading
"Costs."  Def.'s Opp. at 23.  It asserts, "The notion that a
clause governing currency switching would be hidden deep within
the interest rate provision, under the heading 'Costs,' is
commercially unreasonable and defies basic principles of
contract interpretation."  Id.  Lloyds instead argues that this
language grants it the discretion to adjust the Cost of Funds
component "from time to time."  Id. at 22; Def.'s MSJ at 22.
Lloyds also notes that the facility agreements decline to
prescribe a specific methodology for calculating the Cost of
Funds figure.  Def.'s MSJ at 12.

The Court again finds merit in Lloyds' reading of the
contractual term.  To begin, the Court finds that, as Lloyds

correctly observes, the facility agreements do not require
Lloyds to determine the Cost of Funds figure using a specific
calculation.

Turning next to what the agreements do state, the
Court finds that the agreements refer to the right to change the
currency of the loans as belonging to the borrower.  For
example, the agreements state, "The Bank may (but is not obliged
to) *permit the Borrower to switch the currency of the
loan . . . ."*  Ex. 6 to Def.'s Opp. at 2, ECF No. 350-7
(emphasis added).  Additionally, in the acknowledgements section
included at the end of the agreement, the language states, "I
acknowledge that I am fully aware . . . my obligation is to make
payment to the Bank of principal and interest in the currency in
which the loan is denominated from time to time (this will be
different from the currency stated in the Facility Amount in
this letter if I exercise *my option* to borrow in a different
currency) . . . ."  Id. at 9 (emphasis added); see also id. ("I
acknowledge that I am fully aware . . . I have not been advised
by the Bank or any of its employees to borrow in a particular
currency and I do not expect to receive advice or guidance from
the Bank in regard to the risks mentioned herein at any time
during the loan term . . . .").

In support of their contention that Lloyds was also
entitled to choose the currency of the loans, Plaintiffs point

to sections of the agreement stating that the borrower's choice of currency was subject to Lloyds' approval.  See id. at 2 ("The Bank may (but is not obliged to) permit the loan to be drawn down in either Japanese Yen or United States Dollars.  The Bank may (but is not obliged to) permit the Borrower to switch the currency of the loan between the currencies specified above . . . .").  However, Lloyds' right to approve such a currency switch is very different from the right to choose the currency of its own accord.  In fact, the currency-switching feature of the IMS loans was partly what made them so appealing to borrowers in the first place.  Language allowing the bank broad discretion to unilaterally choose or switch the currency would appear to undermine the important and attractive right in the borrower to switch the currency of the loans.

Plaintiffs argue that because Lloyds possesses the "critical right" to switch the IMS loans' currency, this right must be specifically provided for in the facility agreements; however, because no other term in the agreements outlines this right, it necessarily lies in the interest rate provision, under the heading "Costs."  But this argument merely begs the question whether that right really is critical to Lloyds – indeed, the

agreements may not provide for the right because it is not in fact critical.[9]

Finally, Plaintiffs offer several textual arguments in support of their reading.  First, Plaintiffs argue that because "nominate" means to "name" or "designate," use of this term is made in reference to "currency" because a currency may be named.  Pls.' Opp. at 29.  And while Plaintiffs argue that numerical interest rates are calculated, it is also true that a bank may "designate" the cost calculation it intends to employ.  Additionally, Plaintiffs argue that use of the phrase "from time to time," when made in reference to changes in cost, creates a redundancy in the provision because the agreements state that interest rates on the loans will be set every three months.  However, the Court does not find this reading to be problematic, as the "from time to time" language simply appears to refer to this event.  Ultimately, when reading the contract as a whole it

---

[9] Plaintiffs point to certain "Frequently Asked Questions" documents regarding the IMS loan product, which contain language asserting Lloyds has the right to switch the currency of the loans in certain circumstances.  See Ex. 57 to Pls.' MSJ at 8, ECF No. 323-11 ("Please note that Lloyds TSB would always retain the right to switch the currency of the loan to that of the country of the property.  We would not expect to exercise this right unless any term or condition of the mortgage loan was breached."); Ex. 58 to Pls.' MSJ at 19, ECF No. 323-12 (stating the same).  Again, however, the Court finds the facility agreements nowhere include such a right on the part of Lloyds, and as discussed above, such a right in Lloyds would distract from this purpose and undermine borrowers' right to determine the loans' currency.

is clear that Lloyds' construction of the Cost of Funds definition squares with the overall purpose of the facility agreements.

Accordingly, the Court holds that the Cost of Funds provision is not ambiguous, and that the plain meaning of the provision permits Lloyds to include both liquidity costs and liquidity and reserve asset requirements in its cost calculation, as well as to alter this calculation "from time to time."

### b. Whether Lloyds Breached the Express Terms of the Cost of Funds Provision

Arguing that Lloyds violated the express terms of the facility agreements, Plaintiffs contend that "[i]nterest rate increases can . . . be based only on (1) a rise in Lloyds' actual cost of funding Plaintiffs' and the Class's loans, and (2) increases in applicable 'mandatory costs,' i.e., liquidity or reserve asset *requirements* imposed and enforced by regulatory authorities."  Pls.' MSJ at 2 (emphasis in original).  According to Plaintiffs, the LTP charge represents neither an actual cost to Lloyds in funding the loans nor a liquidity requirement.  Id.

Plaintiffs argue that Lloyds breached the facility agreements because the LTP charge did not constitute an "actual cost" of funding the IMS loans; rather, it represented the "cost of funding Lloyds' parent's overhead and operations as a whole,"

making the loans "dramatically more profitable for Lloyds." TAC ¶ 5. Plaintiffs further contend that the LTP charge was built into the Cost of Funds component to address a "perceived risk" of potential future costs due to concerns about liquidity issues brought on by the global financial crisis. Pls.' MSJ at 26. As Lloyds explains, the onset of the financial crisis increased so-called "liquidity risks" – "the risk that lenders, by lending out money for longer periods of times, will no longer have sufficient liquid assets . . . available to pay depositors or other short term creditors." Def.'s MSJ at 13. This led to an increase in the cost of borrowing money on a medium- or long-term basis, leading LBG to implement the LTP charge that Lloyds subsequently passed on to borrowers. Id. at 13-14.

As Plaintiffs argue, however, the IMS loans at issue were funded with three-month money, rather than with the medium- and long-term funding that saw rising costs. Pls.' Opp. at 3, 27; Exs. 30, 44, 46, 59, 62. According to Plaintiffs, because the actual cost to Lloyds on the IMS loans was the cost to cover interest for the three-month period, Lloyds had no right to increase the Cost of Funds on the basis that its cost to maintain those loans had risen, as it had for loan products funded with medium- or long-term money. Id. at 28; see also Rebuttal Expert Report of Michael John Petley ("Petley Rebuttal"), ECF No. 333-4 ¶¶ 4-5.

In fact, Plaintiffs claim that as Lloyds increased the rates it charged borrowers by introducing the LTP charge, the actual cost of borrowing to fund the IMS loans fell.  Pls.' MSJ at 12-13; Pls.' Opp. at 12.  According to the TAC, "Lloyds improperly increased its alleged 'Cost of Funds' during a time when the index measuring the actual cost of funds to Lloyds in Yen or Swiss Francs (for example, the London Inter-Bank Offered Rate for Yen 'LIBOR'), fell dramatically."  TAC ¶ 4.  In response, Lloyds asserts that the facility agreements do not require the Cost of Funds component to track LIBOR or any other reference index.  Def.'s MSJ at 11-12.

Additionally, Lloyds maintains that the IMS loans are funded not with three-month money, but instead with a mix of short-, medium-, and long-term funding.  Def.'s Opp. at 26, Exs. 1, 3, 10, 11, 17; see also Def.'s MSJ at 15 ("Lloyds Bank did not treat Plaintiffs' IMS loans . . . as 90-day obligations: although Plaintiffs agreed to make interest payments to Lloyds Bank every 90 days, they were not obligated to repay the original principal balance until the contractual maturity date (twenty-five years for Dr. Willcox . . . ).");  id. at 12 ("Nor do the Facility Agreements require Lloyds Bank to fund Plaintiffs' 25 and 30 year mortgage loans with money borrowed on a short-term basis . . . .").  This is due to a proprietary "centralized funding model" in which LBG requires Lloyds to

participate, and under which Lloyds obtains funding from LBG for its various loan products.  Id. at 12-13; Def.'s Opp. at 6-7. Lloyds asserts that this funding model allows it to avoid the significant costs it would incur if it were instead required to go out into the market and obtain funding for itself.  Id. at 7. Lloyds states that this centralized funding model had already been in place at the bank prior to 2009, when the LTP charge was initially passed through to borrowers, Def.'s Reply at 5 n.3. On the other hand, Plaintiffs argue that funding activities were only centralized beginning in May 2009, leading to the improper LTP charge to IMS borrowers, Pls.' Opp. at 8-9.

There was much debate during the two-day hearing on the instant motions regarding how Lloyds funds the IMS loans. Lloyds' attorney argued that funding a long-term obligation with short-term money would not make sense from a business efficacy standpoint.  See, e.g., Transcript of Hearing at 12, Jan. 19, 2016.  However, Plaintiffs' attorney cited to multiple examples of documentary evidence suggesting that Lloyds did just that. See, e.g., id. at 66-67.  But in fact, the documentary evidence the parties submitted in support of their positions does little to elucidate how funding has actually operated.  On the one hand, Lloyds presents evidence that seems to state that the loans were funded with a mix of short-, medium-, and long-term money.  For example, Lloyds cites a November 2012 email from a

Lloyds compliance and risk manager to the Hong Kong Monetary

Authority that describes the sources of funding upon which the

Cost of Funds calculation is based:

> [Lloyds] sources its short term funding from
> Customer deposits (Retail & Commercial),
> Bank deposits, Certificates of Deposit and
> Commercial paper, typically in Sterling, US
> Dollars, Euros and Australian Dollars to
> fund our asset portfolios . . . .
>
> [Lloyds] sources its medium/long term
> funding from Customer Deposits, Medium Term
> Notes, Covered Bonds, Securitisation and
> Subordinated Debt instruments, typically in
> the same currencies as above . . . .

Ex. 17 to Def.'s Opp at 1, ECF No. 350-18.  Although it is

unclear from the face of the document whether the Lloyds

representative was speaking to how IMS loans were funded, Lloyds

cites this document in its Concise Counterstatement of Material

Facts for the proposition that "IMS loans are funded with a mix

of short-term, medium-term and long-term funds."  Def.'s Opp.

CSF ¶ K.

Minutes from a LBG Pricing Committee meeting held in

July 2009 state, "IMS - cost of funds reprice[.]  Background to

the proposal:  Over the last 12 months there has been a

significant reduction in the availability of funding across the

world's money markets, leading to an increased cost of funding

medium to long term mortgages and loans.  In response to this,

we are no longer able to hold off from passing these cost

increases to our customers and will therefore be revising our own Cost of Funds rates."  Ex. EE to Def.'s MSJ at 1, ECF No. 299[10]; see also Decl. of Richard Drean,[11] Ex. 1 to Def.'s Opp. ¶ 10, ECF No. 350-2 ("LBG responded to the global financial crisis by strengthening its funding from longer-term sources . . . . As a result, [Lloyds'] IMS Loans . . . are funded by a mix of funding, including short-term, medium-term and long-term.").

Plaintiffs submit documents that seem to state that Lloyds funded its IMS loan products with short-term money only. For instance, an April 2010 presentation given to Lloyds' executive committee summarizes a proposal that was made to Lloyds' Treasury and Trading group to fund the IMS loan portfolio with longer-term money.  Ex. 61 to Pls.' Opp. at 17, ECF No. 391-14.  The presentation explains, "The key financial risk in the current funding structure is the short term funding of the long term mortgage book . . . . IMS have identified it would be possible to mitigate this risk by funding up to 35% of the book at 12 month+ funding . . . ."  Id.  It further states,

---

[10] The portions of sealed documents to which this Order cites are unsealed to the extent necessary to present the factual findings on which this Order is based.  The Court notes that these portions contain very similar information to what has already been filed elsewhere on the public docket or publicized in open court.

[11] Richard Drean was Lloyds' Rule 30(b)(6) designee for Cost of Fund issues in the Dugan case.

"[Treasury and Trading] have declined IMS's proposal to extend their funding profile as there were other elements of the Group balance sheet that are easier to fund at a longer maturity . . . ." Id.[12]

A Treasury and Trading presentation from September 2009 states, "[Lloyds] can only fund these asset positions [i.e. multi-currency mortgages] by funding each quarterly roll for 3 months.  Group is therfore [sic] forced to short fund 100% of these assets in 3m tenor, whilst group policy is to fund 35% of all assets with over one year money.  [Lloyds] can never match fund these mortgages to maturity . . . ."  Ex. 46 to Pls.' MSJ at 2, ECF No. 280.  Other Lloyds documents similarly imply that the IMS loans were funded with short-term money.  See, e.g., Ex. 26 to Pls.' MSJ at 2, ECF No. 268 ("IMS lends in 10 currencies with switching options available to most customers[.]  The majority of the funding is supplied by Treasury & Trading (T&T) at 3 month LIBOR."); Ex. 62 to Pls.' Opp. at 3, ECF No. 367 ("The book is currently funded on a rolling 3 month LIBOR basis (for each currency) with LTP separately applied to ensure that the funding cost incurred by the business reflects the predicted behavioural maturity of the lending.  On this basis IRB is not

---

[12] The foregoing appears to indicate further inconsistencies in the evidence, since Lloyds and Plaintiffs, to some extent, both seem to concur that IMS loans were funded through LBG's centralized funding model from at least 2009.  Pls.' MSJ at 8-9; Def.'s MSJ at 12-13.

incurring a financial risk of the breakage costs that might be incurred if matched (behavioural) term funding was in place and a customer then chose to switch currencies.").

Expert reports submitted by the parties likewise fail to clarify the issue. Plaintiffs' expert contends, "There can be no misunderstanding about the word 'cost' and given it is unequivocally clear from the plethora of [Lloyds'] internal Cost of Funds discussion papers and e-mails, the methodology for funding the IMS loan portfolio was to source funds using the 3 month London Inter-bank market, as I would have expected and as is the market convention for 3 month tenures in foreign currency loan facilities." Petley Rebuttal ¶ 5. Lloyds' expert counters that "[t]he IMS Loans included an absolute maturity of between 7 and 30 years with an average maturity behavior of 5.5 years . . . . As such, the long-term nature of the funding requirement would not be consistent with a 90 day LIBOR maturity." Belanger Report ¶ 47.

Relatedly, as discussed above, the parties dispute whether Lloyds obtained its funding from LBG under a centralized funding model prior to implementation of the LTP charge in 2009. If it did, as Lloyds contends, the LTP charge arguably represented "a more sophisticated methodology for allocating pre-existing liquidity costs which had always been incurred by LBG in obtaining funds." Def.'s Opp. at 10. If the centralized

model was a novel approach established in 2009 when the LTP charge was introduced, as Plaintiffs assert, the more relevant question becomes whether it was appropriate for Lloyds to restructure the manner in which it obtained funding for its IMS loans. Pls.' MSJ at 8-9.

Here again, the record is rife with inconsistencies. Stuart Cheetham, former CEO of Lloyds' Hong Kong branch states, "[T]he Hong Kong branch, to the best of my knowledge and in my time there, did not purchase funding itself . . . . [T]hat activity was centralized into our, certainly latterly, into the Group Corporate Treasury function." Dep. of Stuart Cheetham at 11:1-5, ECF No. 350-11. Importantly, it is unclear from the portions of deposition testimony the parties submitted when and how long Cheetham was at the Hong Kong branch.

Plaintiffs cite to deposition testimony of Andrew Hutchinson, the sole deponent from LBG, as supporting their contention that funding for the IMS loans was decentralized prior to 2009:

> Q: Has [LBG] always managed its funding on a centralized model like you've just described?
>
> A: No. Historically, it was a lot more decentralized.
>
> Q: When did the model go from being more decentralized to the centralized model that's in place now?

A:   In the beginning of May 2009.

Dep. of Andrew Hutchinson at 11:2-9, ECF No. 253-25.   Lloyds
counters that Hutchinson's use of the phrase "*more* centralized"
does not indicate that LBG did not employ a centralized model at
all prior to 2009, see Def.'s Reply at 5 n.3.   Yet even Lloyds'
own expert cites this testimony for the proposition that "[t]o
price its liquidity risk, Lloyds Banking Group moved from a
decentralized model to a more centralized model in May 2009,"
Belanger Report ¶ 39.

The parties also dispute whether the LTP charge was
implemented in response to regulatory requirements or
recommendations.   While the Court has determined that the Cost
of Funds provision does not restrict the cost calculation to
liquidity and reserve asset *requirements*, whether Lloyds acted
in response to regulatory requirements or recommendations will
bear on whether implementation of the LTP charge was
appropriate.   Lloyds contends that the LTP charge was
implemented in response to regulations recommending, and later
requiring, financial institutions to introduce funds transfer
pricing in order to address heightened liquidity risks during
the global financial crisis.[13]   Def.'s MSJ at 12-14; Belanger

---

[13] Lloyds cites to a February 2008 publication by the Basel
Committee on Banking Supervision, which states, "Recent events
highlighted the importance of close coordination between
treasury functions and business lines to ensure a full

Report ¶ 18(c) ("[D]uring the relevant time period, banks were required to abide by regulatory standards requiring that they establish centralized funding desks and incorporate liquidity costs in product pricing, both of which requirements were implemented by Lloyds Banking Group and its subsidiaries, including Lloyds TSB.").

As Plaintiffs point out, however, the regulations upon which Lloyds claims it relied were issued subsequent to the LTP charge and Cost of Funds increases. Pls.' Opp. at 3. Further, Plaintiffs contend that several of these regulations neither addressed product pricing nor required additional liquidity premiums to be charged to borrowers. Id. at 24. Plaintiffs argue that others were merely precatory or forward-looking. Id. at 24-25. Lloyds addresses Plaintiffs' points by claiming LBG had worked in coordination with the United Kingdom's Financial Services Authority to implement funds transfer pricing changes

---

appreciation of potential contingent liquidity risks." Sullivan Decl. Ex. Z at 12, ECF No. 250-27. It also cites a 2009 regulation of the Financial Conduct Authority, a financial regulatory body located in the United Kingdom, as well as a July 2010 letter the U.K. Financial Services Authority sent to the treasurers of all major U.K. banks, requiring them to implement mandatory "funds transfer pricing" systems. Def.'s MSJ at 14 n.5.

in anticipation of what the bank knew would eventually become a regulatory requirement.[14]  Def.'s Opp. at 20 n.5.

Such inconsistencies and incomplete and conflicting information regarding the type of funding Lloyds used for the IMS loans, the manner in which that funding was obtained, and the reasons behind implementation of the LTP charge present material questions of fact that prevent this Court from granting either party's motion for summary judgment on these issues.[15] For example, prior to 2009, was Lloyds itself funding Plaintiffs' IMS loans with 90-day money it obtained on the market; and if so, should Lloyds have kept utilizing such short-term funding notwithstanding the financial crisis commencing in 2008?  Relatedly, if Lloyds was funding the IMS loans itself prior to 2009, was it appropriate to change the funding to LBG's centralized funding model?  Next, if Plaintiffs' IMS loans were funded through LBG's centralized funding model prior to 2009, was the LTP charge added in 2009 simply a different methodology

---

[14] Lloyds also argues that the centralized funding model employed by LBG allowed Lloyds to "avoid the significant costs that would accrue if it were required to obtain its own funding in the market."  Def.'s Opp at 7.  Their argument is essentially that use of the centralized funding model was a cost-effective method that allowed the bank to save funding costs, which offset the LTP charge passed through to borrowers.  Yet as Plaintiffs' attorney pointed out during the hearing, there is no specific evidence in the record that supports this contention. Transcript of Hearing at 113-114, Jan. 19, 2016.

[15] As noted above, the Court has made certain findings regarding the Cost of Fund provision terms.

appropriately applied to the computation of the Cost of Funds?
Additionally, was the LTP charge implemented in response to
regulatory requirements or recommendations?  Also, while the LTP
charge represented an actual cost to Lloyds, was it appropriate
to pass that cost on to Plaintiffs as an actual cost in funding
the IMS loans?  And how was the LTP charge computed?[16]

Because the parties present conflicting evidence
regarding the specifics of Lloyds' centralized funding process,
the money used to fund the IMS loans, and details regarding the
LTP charge, the Court DENIES Plaintiffs' motion for summary
judgment, and GRANTS in part and DENIES in part Lloyds' motion
for summary judgment as to Count I.

The Court makes the following findings as a matter of
law, and GRANTS partial summary judgment in favor of Lloyds with
respect to these findings.[17]  First, the Court finds that the
facility agreements do not prescribe a specific methodology for
calculating the Cost of Funds component of the IMS loans'

---

[16] The Court notes that the organization most knowledgeable
regarding some of these discrepancies - Lloyds' parent, LBG -
has not been joined as a party to this lawsuit, nor has any
discovery been obtained from LBG apart from the voluntary
deposition of Andrew Hutchinson.  See Dep. of Andrew Hutchinson
at 95:25-96:4.

[17] A trial court may reduce the scope of the issues where
appropriate.  See Fed. R. Civ. P. 56(g) ("If the court does not
grant all the relief requested by the motion, it may enter an
order stating any material fact . . . that is not genuinely in
dispute and treating the fact as established in the case.").

interest rate; do not specifically require the Cost of Funds component to track 3-month LIBOR; and do not specifically require Lloyds to fund Plaintiffs' loans with short-term money. The Court also finds that the LTP charge was clearly an actual cost to Lloyds imposed on it by LBG (but finds there is a material issue of fact whether it was appropriate to pass on the LTP costs to Plaintiffs' IMS loans).  Furthermore, the Cost of Funds provision allows Lloyds to include in its Cost of Funds calculation both liquidity costs and liquidity requirements, and does not specifically restrict Lloyds from altering the manner in which it calculates cost for purposes of determining the interest rate on the loans.  The Court further concludes as a matter of law that Lloyds has some degree of discretion with respect to the foregoing findings, which will be discussed *infra*.

The Court otherwise DENIES Lloyds' Motion for Summary Judgment.

## II.  BREACH OF AN IMPLIED TERM LIMITING LLOYDS' DISCRETION TO CHANGE THE INTEREST RATE (COUNT II)

Plaintiffs also allege that Lloyds breached an implied duty to act honestly and in good faith by increasing the IMS loans' interest rates via the LTP charge.  TAC 1 ¶¶ 65-72. Lloyds moves for summary judgment as to this cause of action, asserting that Hong Kong law does not provide for any implied

terms in the instant scenario, and that even assuming, *arguendo*, that the facility agreements did contain an implied term, Lloyds did not violate the term by acting irrationally or perversely. Def.'s MSJ at 24.

### a. Existence of an Implied Term

Hong Kong law, which follows English common law,[18] does not require a court to read into every contract an implied term requiring parties to act in good faith. Greenclose Ltd. v. Nat'l Westminster Bank, [2014] EWHC 1156 (Ch Div. 14 Apr. 2014), at ¶ 150 ("[T]here is no general doctrine of good faith in English contract law."). Instead, when a commercial contract permits one party to exercise discretion as to a contractual term, "[w]hether a term constraining the exercise of that discretion is to be implied depends upon the relevant factual circumstances." Pac. Long Distance Tel. Corp. v. New World Telecomms., Ltd., [2012] HCA 1688/2006 at ¶ 38, ECF No. 246-6. Such a term must be "necessary to give business efficacy to the contract." Societe Generale Bank & Trust v. Panjwani, (unreported, 2010) HCA 725/2009, per Leggat LJ, § 27 (citing BP Refinery (Westernport) Pty Limited v. Shire of Hastings, (1977) 180 CLR 266, ¶¶ 40-43, 50, ECF No. 67-6), ECF No. 67-7.

In Pacific Long Distance, a contractual provision granted defendant, a telephone service provider, discretion to

---

[18] See footnote 6 supra.

"revise the Agreement and/or introduce additional terms and conditions from time to time." Id. at ¶ 32.  The defendant availed itself of this provision by significantly raising certain telephone rates. Id. at ¶¶ 32-33.  While the provision contained no explicit limit on the defendant's discretion to set rates, the Hong Kong court nevertheless found that the company had breached "an implied term that the rights set out in that clause should be exercised on a commercial footing, reflecting market rates for the provision of such services, but not for any collateral purpose." Id. at 48, 51.

     In arguing that no term should be implied restricting its discretion to change interest rates, Lloyds asserts that Hong Kong courts are reluctant to imply such terms into contracts between sophisticated parties.  Def.'s MSJ at 25.  In support of this claim, Lloyds cites to Greenclose, which states, "So far as the 'Good Faith' condition is concerned, there is no general doctrine of good faith in English contract law and such a term is unlikely to arise by way of necessary implication in a contract between two sophisticated commercial parties negotiating at arms' length." [2014] EQHC 1156 at ¶ 150.

     On the other hand, Plaintiffs argue that sophistication is only one of many potential factors a court may consider in determining whether to imply a term into a contract.  Pls.' Opp. at 33; see Pac. Long Distance, HCA 1688/2006 at ¶ 48

(reading an implied term into the parties' contract without considering their sophistication).  HCA 1688/2006, ¶ 48.  In fact, Plaintiffs assert that Hong Kong courts have actually implied "a duty to act honestly and fairly" into banking services agreements involving sophisticated parties due to the "banker/customer relationship."  DBS (Hong Kong) v. San-Hot Industrial Co., HCA 279/2008, ¶ 213; see also Brewer Opp. Decl. at ¶¶ 35-36, ECF No. 343-1.

Lloyds argues that Willcox is "an experienced real estate investor, having purchased at least five luxury condominiums or residential real estate properties in Hawaii . . . and employing a property manager to oversee his real estate holdings."  Def.'s MSJ at 26.  Yet regardless of whether Willcox was a "sophisticated" investor, the case law suggests that sophisticated parties may still benefit from the incorporation of implied terms into commercial contracts.  Given this, Willcox's "sophistication" is not determinative of the issue.

In arguing against an implied term, Lloyds also maintains that the facility agreements were negotiable, given that Plaintiffs had the option to choose the "currency or currencies of the loan, whether to make payments on an interest only or principal and interest basis, and the contractual maturity of the loan."  Def.'s Reply at 14-15 n.11.  However,

these are not the significant terms at issue in this case.
Importantly, the parties did not negotiate at arms' length the
Cost of Funds provision, which is the subject matter of this
litigation.   In fact, the IMS loans belonging to the entire
class are based on facility agreements that contain a Cost of
Funds term that is substantially the same in each of the
respective contracts.   See, e.g., Def.'s CSF ¶ 20 ("The six
facility agreements executed by Plaintiffs contain an *identical*
provision prescribing the interest rate to be charged to their
IMS loans.") (emphasis added).   That Plaintiffs have leeway to
make decisions regarding terms (such as currency, principal and
interest payments, and maturity of the loan) for which the
contract specifically provides a choice to the borrower is a
different matter from Plaintiffs' ability to negotiate the
entirety of the contract at arms' length, and again, these are
not the key terms at issue here.   In practice, the facility
agreements appear more akin to form contracts that Lloyds
entered into with each of the IMS borrowers in the class.

     For the foregoing reasons, the Court *sua sponte*
concludes as a matter of law that an implied term in the
facility agreements limited Lloyds' exercise of the discretion
afforded it by the Cost of Funds provision.   The Court notes
that the Ninth Circuit has "long recognized that, where the
party moving for summary judgment has had a full and fair

opportunity to prove its case, but has not succeeded in doing so, a court may enter summary judgment *sua sponte* for the nonmoving party." Albino v. Baca, 747 F.3d 1162, 1176 (9th Cir. 2014).  This authority is made explicit in Rule 56, which states, "After giving notice and a reasonable time to respond, the court may . . . grant summary judgment for a nonmovant . . . ."  Fed. R. Civ. P. 56(f).

       The Ninth Circuit has expounded on Rule 56's notice requirement, stating, "Before *sua sponte* summary judgment against a party is proper, that party 'must be given reasonable notice that the sufficiency of his or her claim will be in issue:  Reasonable notice implies adequate time to develop the facts on which the litigant will depend to oppose summary judgment.'"  Albino, 747 F.3d at 1176 (quoting Buckingham v. United States, 998 F.2d 735, 742 (9th Cir. 1993)).  In concluding that a moving party had sufficient notice for purposes of Rule 56, the Albino court found that party to have had a "full opportunity" to gather evidence supporting its claim, and that as the movant for summary judgment, it was on notice of the need to come forward with all of the evidence in support of its motion.  Id. at 1177.

       This Court similarly finds that Lloyds, as the movant for summary judgment as to Count II, had both a "full and fair opportunity," and indeed the incentive, to come forward with all

of the evidence in support of its motion. Plaintiffs' arguments regarding the implied term having been fully set forth in both the TAC and Plaintiffs' Opposition Brief, Lloyds "had an adequate opportunity to show that there is a genuine issue and that [its] opponent is not entitled to judgment as a matter of law." Kassbaum v. Steppenwolf Productions, Inc., 236 F.3d 487, 494 (9th Cir. 2000). The record is therefore sufficiently developed to permit this Court to consider summary judgment on Count II, and when viewing the evidence in the light most favorable to Lloyds, the Court finds it appropriate to grant partial summary judgment in favor of Plaintiffs.

For the foregoing reasons, the Court *sua sponte* GRANTS partial summary judgment to Plaintiffs on Count II.

### b. Standard Limiting the Exercise of Discretion Under the Implied Term

The Court next determines what the implied term shall require. At the hearing, Lloyds' attorney stated that both parties agreed that Nash was instructive regarding the standard in limiting the exercise of a lender's discretion under the implied term. Transcript of Hearing at 34, Jan. 20, 2016. Plaintiffs' attorney separately stated that Nash controlled this issue. Transcript of Hearing at 118, Jan. 19, 2016. Moreover, both parties cite to Nash in their briefs as laying out the appropriate standard. Def.'s MSJ at 30; Pls.' Opp. at 36.

- 43 -

Nevertheless, the parties dispute what the standard actually states.

Because both parties agree that Nash is authoritative, the Court looks to that case as providing the implied term's standard in limiting the exercise of a lender's discretion to set interest rates.  In Nash, plaintiffs and defendant lender entered into mortgage agreements that contained variable interest clauses, with interest to "be charged at such rate as the Company shall from time to time apply."  [2001] EWCA Civ. 1466, at ¶¶ 1, 8.  When defendant lender invoked this clause in raising rates, plaintiffs alleged that the lender had breached the mortgage agreements by "fix[ing] the rates of interest (a) without reference to prevailing market rates, and/or (b) taking into account an irrelevant consideration, namely its own financial difficulties."  Id. ¶¶ 14, 45.

Addressing plaintiff's arguments, the Nash court found that a lender's raising interest rates in response to financial difficulties did not constitute a breach of the implied term. Id. ¶ 46.  The court explained, "If a lender is in financial difficulty . . . because it is obliged to pay higher rates on interest to the money market, then it is likely to have to pass those increased costs on to its borrowers.  If in such circumstances the rate of interest charged to a borrower is increased, it is impossible to say that the discretion to set

- 44 -

the rate of interest is being exercised for an improper purpose, capriciously, arbitrarily or in a way in which no reasonable lender would reasonably do." _Id._

Thus, recognizing that a lender must take into account "purely commercial considerations," such as financial difficulty, in setting rates, the court found that an implied term in the mortgage agreements prevented defendant lender from exercising this discretion "dishonestly, for an improper purpose, capriciously or arbitrarily," or "in a way which is so unreasonable that it can be said of it that no reasonable lender would take that course if placed in that situation." _Id._ ¶¶ 32, 36, 41-42, 46-47.

The Court therefore finds that, when exercising its discretion to change interest rates, Lloyds must do so in a manner that comports with "purely commercial considerations," including whether it "is in financial difficulty because it is obliged to pay higher rates on interest to the money market"; however, Lloyds must refrain from acting "dishonestly, for an improper purpose, capriciously, or arbitrarily," or in a manner so unreasonable that no reasonable lender would do the same (hereinafter referred to as the "Nash standard").

### c. Whether Lloyds Breached the Implied Term Limiting its Discretion to Change Rates

According to the <u>Nash</u> standard, whether Lloyds breached an implied term limiting its discretion to change interest rates depends in part on whether LBG's LTP charge to Lloyds bank was an appropriate cost to pass on to Plaintiffs – a question as to which issues of material fact remain, as discussed above.  The Court reiterates some of the questions that bear on this issue, as non-exclusive examples: (1) whether, prior to 2009, Lloyds was itself funding Plaintiffs' IMS loans with 90-day money, and if so, whether it should have continued utilizing such short-term funding; (2) if Lloyds was funding the IMS loans itself prior to 2009, whether it was appropriate to change the funding to LBG's centralized funding model and to pass on to Plaintiffs the LTP charge; (3) whether, prior to 2009, Plaintiffs' loans were funded through LBG's centralized funding model, and if so, whether it was appropriate to implement the LTP charge and to pass it on to Plaintiffs; and (4) whether Lloyds appropriately acted pursuant to regulatory requirements or recommendations.

In sum, various questions of material fact preclude this Court from granting summary judgment in favor of either party on the issue whether Lloyds breached an implied term

limiting its discretion to adjust interest rates, as determined by the <u>Nash</u> standard.

For the reasons set forth above, the Court DENIES Lloyds' motion for summary judgment on Count II.

### III. PLAINTIFFS' REQUEST FOR DECLARATORY RELIEF

Because issues of material fact remain as to whether Lloyds breached the facility agreements by passing on the LTP charge to borrowers, the Court DENIES Plaintiffs' request for declaratory relief.

### CONCLUSION

For the foregoing reasons, the Court:  (1) DENIES Plaintiffs' Motion for Partial Summary Judgment on Their and the Putative Class's Claim for Breach of Contract on Count I; (2) GRANTS in part and DENIES in part Lloyds' Motion for Summary Judgment; (3) *sua sponte* GRANTS partial summary judgment to Plaintiffs on Count II, and (4) DENIES Plaintiffs' request for declaratory relief.

Regarding its second and third holdings, the Court finds that the Cost of Funds provision in the facility agreements does not prescribe a specific methodology for calculating the Cost of Funds component of the IMS loans' interest rate; does not specifically require the Cost of Funds component to track 3-month LIBOR; and does not specifically require Lloyds to fund Plaintiffs' loans with short-term money.

However, the agreements do allow Lloyds to pass on liquidity
costs and liquidity requirements to borrowers.  Additionally,
the Cost of Funds provision does not specifically restrict
Lloyds from altering its cost calculation.  However, the Court
also finds an implied term in the agreements which limits
Lloyds' discretion to alter interest rates.  That implied term
requires Lloyds, when altering interest rates, to do so in a
manner that comports with purely commercial considerations,
including whether it is in financial difficulty because it is
obliged to pay higher rates on interest to the money market;
however, Lloyds must refrain from acting dishonestly, for an
improper purpose, capriciously, or arbitrarily, or in a manner
so unreasonable that no reasonable lender would do the same (the
Nash standard).

        The Court otherwise DENIES both parties' motions for
summary judgment, as issues of material fact regarding Lloyds'
alleged breach of the express and implied terms of the facility
agreements remain.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, February 11, 2016.

Alan C. Kay
Sr. United States District Judge

Willcox v. Lloyds TSB Bank, PLC, et al., Civ. No. 13-00508 ACK-RLP, Order Denying Plaintiffs' Motion for Partial Summary Judgment on Their and the Putative Class's Claim for Breach of Contract on Count I, Denying Plaintiffs' Request for Declaratory Relief, Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, and *Sua Sponte* Granting Partial Summary Judgment to Plaintiffs on Count II.